[Civ. No. 632. First Appellate District.—October 29, 1909.]

In the Matter of the Guardianship of LOREN COBURN, an Incompetent Person. AZRO A. COBURN, Petitioner, Respondent. CARL J. COBURN as Guardian, etc., Respondent. LOREN COBURN, Alleged Incompetent, Appellant.

GUARDIANSHIP OF ALLEGED INCOMPETENT PERSON—SHOWING REQUIRED. In order to justify the appointment of a guardian of an alleged incompetent person, under the provisions of sections 1763 and 1764 of the Code of Civil Procedure, the court must find the person for whom the guardian is appointed mentally incompetent to take care of himself and manage his property. The evidence must show that his mind is so far gone, and so weak and feeble, that he does not realize and comprehend the value and prudent management of his property, and is not sufficiently normal to care for it in the usual acceptation of that term.

ID.—APPOINTMENT, WHEN UNJUSTIFIABLE. — Notwithstanding mere debility or some impairment of memory, one who is in mental health and vigor, and capable of managing the property which he has acquired, should not be deprived of his property and liberty by the appointment of a guardian. If one is capable of transacting ordinary business relative to his property, and understands the nature of his business and the effect of what he does, and can exercise his will relative thereto with discretion, notwithstanding the influence of others, he is not of unsound mind, within the meaning of the statute, and should not be deprived of the control of his property.

ID.—SUPPORT OF FINDING AS TO INCAPACITY—REVIEW OF EVIDENCE— DISAGREEING OPINIONS.—Upon an elaborate review of the evidence, by Cooper, P. J., in delivering the opinion, it is held by him insufficient to support the finding of the superior court that the appellant "is incapable of taking care of himself and managing his property." But Hall, J., and Kerrigan, J., while of opinion that the evidence on this point is not as satisfactory as it might be, yet hold that there is some evidence to support the finding, and that it cannot be disturbed upon appeal, under the rule governing this court.

ID.—RULE AS TO CONFLICT OF EVIDENCE.—An appellate court will not reverse a finding, if there is a substantial conflict in the evidence; but the evidence to raise a conflict must be such as to present a fair and reasonable difference of opinion. A few general statements without substantial reasons are not sufficient to raise a conflict, where the evidence fully establishes the contrary.

ID.—INADMISSIBLE EVIDENCE—OPINIONS OF WITNESSES AS TO MEN-
TAL CAPACITY.—The court erred in allowing witnesses, against the
appellant's objection, to state their opinions as to his "ability to man-
age his property," and as to "whether, in their opinions, he was
likely to be imposed upon by designing parties." By this testimony
the witnesses were allowed, in effect, to give their opinions upon
the general merits of the case, and as to questions directly in issue,
which may not be done.

APPEAL from a judgment of the Superior Court of San
Mateo County, and from an order denying a new trial.
George H. Buck, Judge.

The facts are stated in the opinion of the court.

A. J. Treat, A. Kincaid, and A. H. Jarman, for Appellant.

Jordan, Rowe & Brann, and Ross & Ross, for Azro A. Co-
burn, Respondent.

Ross & Ross, for Carl J. Coburn, as Guardian, etc., Re-
spondent.

COOPER, P. J.—In the month of February, 1908, a peti-
tion was filed by Azro A. Coburn, a resident of Massachu-
setts, to have Loren Coburn, his aged uncle, who resides in
San Mateo county, adjudged incompetent, and to have a
guardian appointed of his person and estate. The petition
as amended alleges that the said Loren Coburn, by reason of
old age, physical disability and weakness of mind, is unable
to take care of himself and manage his property. This allega-
tion was denied, and upon the issue so made the case went
to trial before the court without a jury.

At the conclusion of the trial the court made an order ad-
judging Loren Coburn incompetent and unable to take care
of himself and manage his affairs, and appointing Carl J.
Coburn, another nephew, guardian of his person and estate.
This appeal is from the order so made and from an order
denying appellant's motion for a new trial.

It is contended that the evidence is insufficient to support
the order; and in view of the conclusion we have reached that
is the principal question that will be discussed.

It is provided in the code (Code Civ. Proc., sec. 1763) that
when it is represented to the court upon a verified petition

"that any person is insane or from any cause mentally incompetent to manage his property," the court or judge must cause notice to be given and hear the matter. It is further provided (sec. 1764): "If, after a full hearing and examination upon such petition, it appear to the court that the person in question is incapable of taking care of himself and managing his property, such court must appoint a guardian of his person and estate, with the powers and duties in this chapter specified."

It is evident from the provisions quoted that, in order to justify the appointment of a guardian, the court must find the party for whom the guardian is appointed mentally incompetent to take care of himself and manage his property.

It is a fundamental principle, based upon the plainest dictates of justice, that before a person can be deprived of his liberty and his property on account of his mental incompetency, he must be brought clearly within the terms of the statute, and the evidence must show that his mind is so far gone and so weak and feeble that he does not realize and comprehend the value and prudent management of his property, and is not sufficiently normal to care for it in the usual acceptation of that term.

A man whose mental capacity has been such that he has outstripped the great majority of mankind in business affairs, and has accumulated much of this world's goods, is not for light or trivial reasons, or even on account of hallucinations, to be deprived of his property and of his liberty. It must clearly appear to the court that he is mentally incompetent to manage his property; that his mind is affected to such a degree as to deprive him of sane and normal action.

It was the doctrine of the earlier cases in the English court of chancery not to deprive a person of his liberty or his property for mere imbecility of mind not amounting to idiocy or lunacy. It was not sufficient that he was weak, worn out with age and incapable of managing his estate. (*Ex parte Banerley*, 3 Atk. 168; 3 Eq. Cas. Abr. 580; *Lord Donegal's Case*, 2 Ves. 407; *Beaumont's Case*, 1 Whart. 52, [29 Am. Dec. 33].) The doctrine is not now so strict as formerly, and the jurisdiction of the courts has been held to extend to some cases where the party is not an idiot or a lunatic. (*In the Matter of Barker*, 2 Johns. Ch. [N. Y.] 232.) It was there said by

Chancellor Kent: "The object is to protect the helpless; and the imbecility of extreme old age, when the powers of memory and judgment have become extinct, seems, as much as the helplessness of infancy, to be within the reason and necessity of the trust. I am aware, however, that the inquiry must in many instances be peculiarly delicate, because it concerns the character of the party, and his natural rights, and because of the difficulty there is in ascertaining the extent of the decay of the mind necessary to form a proper case for the interference of the court."

In Woerner on American Law of Guardianship, section 113, many cases are cited, and the history of the law and the modern doctrine given. It is thus stated: "It is sufficient that he be mentally incompetent to govern himself or to manage his own affairs, from whatever·cause th's incapacity may arise. Hence permanent mental weakness amounting to such incapacity, arising from advanced age, sickness, habitual drunkenness, or imbecility, constitutes in law 'Unsoundness of mind'; and as such becomes tantamount in its effects to those produced by idiocy or lunacy, for such conditions all equally express mental incapacity for the government of one's affairs. Such a person is in legal intendment *non compos mentis.* . . . It is to be observed, however, that the unsoundness of mind which will justify the appointment of a guardian must be more than mere debility or impairment of memory; it must be such as to deprive the person affected of ability to manage his estate. If the defendant is capable of transacting the ordinary business involved in taking care of his property, and if he understands the nature of his business and the effect of what he does, and can exercise his will with reference to such business with discretion, notwithstanding the influence of others, he is not of unsound mind within the meaning of the statute, and should not be deprived of the control of his property."

And it has been held that the mental imbecility (in the language of the code) must be such as to make the incompetent incapable of taking care of himself and managing his property. (*In re Lindsley,* 44 N. J. Eq. 564, [6 Am. St. Rep. 913, 15 Atl. 1].)

*In the Matter of Collins,* 18 N. J. Eq. 253, it appeared that the alleged incompetent was in the hundredth year of her

age.  Her sight was very much impaired and her hearing somewhat, but the court held that a commission *de lunatico inquirendo* should not issue.  The court said: "Her sight is very much impaired and her hearing somewhat.  At her age the presumption of law is not against her soundness of mind, however great the probability in fact may be that she is not sound. . . . The facts proved, while they show that her senses and physical powers are much impaired, and that her mental faculties are somewhat weakened, fail to show anything that would amount to unsoundness so as to make her incapable of managing her affairs.  She may be so weak and infirm as to be easily influenced and imposed upon, which would be a reason for setting aside any instruments or transactions executed under the effect of such influence, but this does not amount to unsoundness, such as to take from her the control of herself and her property."

In *Re Storick,* 64 Mich. 685, [31 N. W. 582], it was said by the supreme court of Michigan, in an opinion written by the chief justice: "The statute does not say merely 'incompetent' but 'mentally incompetent.'  It does not refer to persons who are sane, but not perhaps as wise or intelligent as some other persons.  It applies to those whose mind is so affected as to have lost control of itself to such a degree as to deprive the person affected of sane and normal action.  Unless the petition either follows the words of the statute, or uses language and states facts fully equivalent, it cannot give jurisdiction.  This is a class of cases in which the citizen is sought to be deprived of both liberty and property; and those who seek to accomplish such a result must do so upon statements that, if true, leave no doubt that the case falls within the statute. . . . One may be so weak or crippled as to be compelled to leave his affairs in the hands of servants or agents, and is no more incompetent for that reason than a very wealthy man is who cannot possibly look after all the details of his business.  Neither is there any legal standard of business wisdom.  Men may be unwisely speculative or unwisely penurious, but this is not insanity.  A jury of merchants might very easily approve or disapprove where a jury of persons unaccustomed to commercial ventures and expenditures would think the reverse.  Every man may spend or save as he chooses, as long as he does not come within the pro-

hibitions of the law.  As long as he possesses a mind normally sound, he is entitled to free agency.  It is as cruel and unlawful to interfere with the liberty of the old as of anyone else; and the law cannot favor or permit this liberty to be diminished." (See further *In re Bassett*, 68 Mich. 348, [36 N. W. 97].)

In the case at bar the court found that appellant "is incapable of taking care of himself and managing his property." In our opinion the evidence fails to sustain the finding.

The appellant, at the time of the trial, was over eighty-two years of age, and was in the enjoyment of good health.  The evidence shows without contradiction that he was active, attentive to business and had not been confined to his bed for years.  He is the owner of some thirty-five thousand acres of grazing and farming lands situate in San Mateo county, Monterey, Merced and Fresno counties.  He is also the owner of timber lands, cattle, horses and farming utensils.  His property is stated to be worth over a million dollars.  His life has been devoted to the accumulation of property.  While he has been penurious, a close man to deal with, yet he has always been frugal and free from dissipation of any kind.  His wife died about thirteen years before the trial, and he has only one child living—a son about fifty-two years of age, who is helpless and who has been nursed and cared for by appellant and Miss Upton, his sister in law, who has lived with him. There is no evidence of any physician or alienist as to any unsoundness of mind or mental incompetency.  There is not a scintilla of evidence that the appellant has ever squandered any of his property or that he has been imposed upon by any designing person.  He has never, so far as the evidence shows, lost a dollar, an acre of land or a cow through any mismanagement.  The evidence relied upon to show mental incompetency is almost entirely that of two nephews, the most active of whom was appointed guardian of his person and estate. It may not be amiss to remark that it plainly appears that there was some fear in the minds of the nephews that the appellant might by will leave some portion of his estate to his wife's sister, Miss Upton.  In any event it appeared in evidence that the appellant had made no will, and of course, if the order should stand, he could never hereafter make a will unless restored to competency by a decree of court.

The main acts which it is claimed show mental incompetency are certain deeds, alleged to be signed by appellant, to different pieces of property which he did not and never did own. There is some evidence tending to show that appellant believed that he owned more land in San Mateo county than he really did own; and this belief was founded upon the fact that the title to his ranch, the Punta del Ano Nuevo, which was a Mexican grant, was bounded on the north by the Gonzales ranch, and appellant claimed—whether founded upon sufficient reasons or not—that the northern boundary of the grant extended some three or more miles farther north than the line up to which he had occupied. The claim of appellant is stated by Dr. Robertson, the experienced alienist, who examined him as to the matter, as follows: "I examined him and others in regard to that, and he went into the details with me, explained the long Spanish grant story, and the final answer he made to my last question was that the Pacific Ocean bounded him on the west and he could not go into the ocean; that his southern boundary was absolutely fixed and he could not go beyond a certain point; that his eastern boundary was the mountain—he could not be certain of that because it had not been surveyed, but on the north he was bounded by the Gonzales ranch; wherever that line ran his property stopped. He insisted he owned around the town of Pescadero, and he is a little bit garrulous—there is another evidence of old age, I forgot to mention when I got him on the subject of his property it was hard to divert his mind from it, but at the same time he said when that survey was run, he would only claim what was his in this survey, and what the law said was his he would take; if the land happened to be two or three miles beyond his present property, that he was paying taxes on, he would accept that as the boundary, and certainly force his neighbors out of what belonged to him; but if it came back a half a mile or mile within the property he now claims, that he would at once vacate; that he did not want an acre of land belonging to anybody else, and whatever that survey showed to be the truth he would be absolutely willing to stand by it. That he wanted nothing but his own, but what was his own he absolutely wanted, irrespective of present possession. In other words, he realized that the property he now owns and now occupies and now

pays taxes on belongs to him and will belong to him until that survey is made. He hopes when the survey is made it will include two or three miles that belong to his neighbors.'' And the appellant says that Carl Coburn told him that he owned more land north of his grant, and he thus states the matter in his testimony:

"Q. Has Carl Coburn ever said anything to you about the northern line of your property? A. He spoke to me about the northern boundary. I told him my northern boundary joined on what is called the Gonzales—I think that that is the name of the grant—the southern boundary of Gonzales was my northern boundary of the Punta del Ano Nuevo; that shows on the record; the west of my grant is the ocean.

"Q. Yes, sir. Now, without regard to the other boundaries, what did he tell you with regard to the northern boundary, where he thought that was? A. He said he had been looking the thing over, and it was north of Spanish Town about a mile. I said I didn't know that; I wasn't aware it ran so far north. Well, he said my grant called for so many thousand acres. He wanted to know how many acres there was, and I said I understood there were seven thousand seven hundred and some odd acres in the Spanish grant—not American grant but Spanish grant. Well, to come to reckon that, the American is four times that amount, and it comes close on to thirty thousand acres in the grant. The grant of course was a Spanish grant. I don't know anything about the United States grants; I never had anything to do with the United States grants; my deed of the property came from Mexico.

"Well, now, without regard to the history—I am not going into the history of the Mexican grant, but just what Carl Coburn told you. I understand that Carl Coburn told you that the northern line was far to the north of Pescadero? A. He said it was beyond Spanish Town. 'Well,' I said, 'I wasn't aware of that.' 'Well,' he said, 'It comes to the Gonzales southern boundary.' 'Well, I don't know exactly where the Gonzales southern boundary was, because I had never had that surveyed, and the grant has never been surveyed, only little portions of it—that is, the grant Punta del Ano Nuevo.' ''

With these facts as a basis let us examine and analyze the testimony as to incompetency.

It appears that in the year 1907, the appellant had litigation with the Gazos Creek Mill Company, involving important rights as to a sale of growing timber and rights of way by the appellant to said company. The case had been decided against appellant in the superior court of San Mateo county; and Carl J. Coburn appeared to be very anxious to assist in appealing the case, and offered his services free to assist his uncle in any manner he could. At all events, Carl testified that he told the old man that he could not go ahead and assist in employing attorneys and attending to matters without some authority, and that he not only told his uncle this but that he refused to do anything without a power of attorney; that on the seventeenth day of August, 1907, a general power of attorney was executed to him and signed by Loren Coburn. The power of attorney was introduced in evidence; and hence we may assume that thereafter Carl was the attorney in fact of his old uncle. Of course as such it was his duty to act with the utmost good faith toward his uncle, who had imposed confidence in him. It appears that about the fifteenth day of January, 1908, Carl wrote to the other nephew, Azro Coburn, who resided in Holyoke, Massachusetts, and in response to the letter Azro came to California. This letter was not shown nor was it produced in evidence, although some reference was made to its contents. There is nothing to show that any deed had been made by appellant, or any property disposed of up to this time. In fact, the only thing that is stated by Carl as a reason why he wrote to Azro is the situation regarding the lawsuit with the Gazos Creek Mill Company, which he was trying to compromise, and of which one of the attorneys he had employed advised the compromise or settlement, by having appellant pay the company $23,000. This appellant refused to do, claiming that he was right, and would win the case on appeal. The result shows that the judgment of appellant was correct, for he did win the case on appeal. (*Gazos Creek Mill Co.* v. *Coburn*, 8 Cal. App. 150, [96 Pac. 359].) It is a significant fact that proceedings had been instituted to have appellant declared incompetent some eight or nine years before, in which proceedings Carl Coburn was a witness, and claimed at that time that his uncle was mentally incompetent. Those proceedings resulted in favor of appellant; and it is in evidence, and not contradicted, that

since that time he has accumulated some $300,000. We have looked in vain for any evidence of any act tending to show mental incompetency up to the time that the letter was sent to Azro by Carl.

In response to the letter from Carl, Azro arrived in San Francisco on January 26, 1908, and it appears, by appointment, met his cousin Carl at the Hotel Jefferson in San Francisco. While there appellant called to see his nephew— whether by request or not does not appear. Azro describes the visit as follows: "We went upstairs into my room and visited there during the evening, and during the evening I had pleasant conversation with uncle, and talked some about his affairs, and I asked him about certain litigation he had got into, how he was coming out on it, and he told me he was coming out all right, and I told him I hoped he would. He made only a short call that evening."

Carl describes this call of his uncle as follows: "He came to the Jefferson Hotel, where Mr. Azro Coburn and I were stopping, and he met us there. Azro Coburn took him up to his room, and they began to have a talk about the timber case. The timber case, I believe, was set for the 27th of this month. Mr. Azro Coburn and I had consulted Mr. Loren Coburn's attorneys. We knew—at least I knew—the case was in a very precarious condition; that there was danger of the case being decided against us. Mr. Azro Coburn asked his uncle, he says, 'How is everything?' and asked him about his cases and how they were going along; asked him if he had not better try and do something to settle the case before it was decided."

We will now review briefly what these two nephews did, according to their own testimony, in order to procure evidence as to the mental incompetency of appellant.

The first thing, according to their testimony, was to procure a deed from appellant to one Richards of the city hall in San Francisco, which deed made no reference to the city hall by name. Both Azro and Carl testified that they saw the old man sign this deed. It is dated January 28, 1908, evidently showing that diligence was being used after Azro arrived in San Francisco. It does not appear that any explanation was made to appellant as to why they wanted the deed signed. Azro testified: "I did not read the deed to Loren Coburn. Nobody read it to him. I don't know that

anybody called his attention particularly to the property described therein. I don't know what Carl said. I saw him sign it. That is all I saw about it. I saw him read it, that is all. I assume he did because his lips moved. I don't know whether or not he was told that this was some other document, a lease of a portion of his property in Pescadero. I did not hear any such remark."

Carl testified that the deed was signed by appellant without any representations being made to him; that "he came to sign that document by me asking him to in my office at Pescadero."

There were two deeds offered in evidence procured in substantially the same way, and some four or five leases. The leases were obtained by stating, or leaving appellant to infer, that they were of property claimed by him to be within the calls of his grant. These instruments were procured in nearly every case at the instance of Carl, without any explanation to the old man as to the description.

We think it is sufficient to say that they were procured by one in whom appellant had confidence and who held his power of attorney. Azro testified that the papers, deeds and leases were all procured for the purpose of being used in these proceedings. In his own language he said: "It was contemplated, if we could get sufficient evidence that he had done something that was detrimental to his own property, or liable to, then there might be grounds for this proceeding. It seems to me the power of attorney was almost sufficient, but at the same time I wanted to have sufficient evidence. I wanted to be sure, not that Mr. Coburn could escape these proceedings, but I wanted to be sure and prove to the court that he was incompetent; that he might be likely to be influenced by some designing person"; and Carl testified to the same effect. He said: "All of these papers were prepared in contemplation of proceedings of this character, just as testified to by Mr. Azro Coburn, and also to please Mr. Coburn. Mr. Coburn was not satisfied unless somebody would agree to take a lease, and acknowledge his authority over that grant, and I saw no harm in doing so, that is, so far as this lease to Dr. Banks and Mr. Perry were concerned—simply to satisfy him."

Not only was Carl Coburn the attorney in fact of the old man, but he admits that he was friendly with him, pretend-

ing to advise and assist, while in fact consulting with Azro
and his attorneys in the initiation of proceedings hostile to
him, and preparing the deeds and procuring the signatures
thereto for evidence. He not only advised appellant, but as-
sisted him in getting witnesses for the trial, not even inti-
mating that he was using all his endeavors to have his uncle
adjudged incompetent, and to be appointed guardian. If
appellant was mentally incompetent, Carl should at least have
been honest and fair with him, and not have resorted to de-
ception for the purpose of procuring evidence. These deeds
and leases were prepared from January 30 to February 6,
1908, at least seven of them within a period of seven days.
The petition to have a guardian appointed was filed on the
eighth day of February, 1908, and the trial commenced on the
15th. Azro Coburn thus procured sufficient evidence within
a week to satisfy himself that his uncle was incompetent, not
based upon evidence of what occurred before he came to Cali-
fornia, but based upon evidence of acts done within the week.
Surely if appellant was mentally insane on the first day of
February, 1908, ample evidence could have been procured
among his neighbors in the community where he had spent
nearly all his life. In our opinion the mere signing of these
deeds and leases, if true, is not sufficient to show mental in-
competency; and it may further be remarked that appellant
denies that he ever signed them.

We do not attach any great importance to the testimony of
Carl Coburn to the effect that appellant wanted him to raise
quite a sum of money to be used in part in bribing certain
judges. Appellant denies that he ever made such a request
or even intimated it. It does not appear that such bribes
were ever offered or attempted, and the fact, if true, would
not of itself be sufficient to show mental unsoundness. Carl,
according to his own evidence, agreed to take part in the con-
templated bribing, and it does not appear that he ever pro-
tested or even suggested that it would be wrong.

We therefore may eliminate from the case the acts as to the
Gazos Creek litigation, in which the appellant had the best
judgment of them all; the signing of the deeds and leases
without explanation to him by his attorney in fact, who had
been a witness against him nine years ago in a similar pro-
ceeding, and who deceived him by pretending to be his friend;

the claim to lands north of Pescadero, which claim, even if not well founded, was a harmless delusion. Then what is the evidence of the mental unsoundness of appellant? No physician or alienist was called by petitioner, nor did he have any medical examination made of appellant. Dr. Banks testified that in his opinion appellant was "not competent to manage his own business," but he said nothing as to his "mental sanity"; and not only this, but it appeared from his evidence that his acquaintance was what he called a "mere casual one." He further testified that his opinion was based to a great extent upon the signing of a lease by appellant to himself. Dr. Banks, upon consultation with Carl and Azro Coburn, paid appellant five dollars for one month's rent, and agreed to continue to pay five dollars per month for a lot which appellant claimed to be within his boundaries. In cross-examination he said, "I cannot recall one instance that I know of by observation in which Mr. Coburn has been gotten the best of."

E. B. Gayety, a witness for petitioner, when asked whether he regarded appellant as a man who is competent to manage his own affairs, replied, "Sometimes I do, sometimes I do not." In cross-examination he said, in speaking of appellant: "He gives his own personal attention to that, and makes his own leases with his tenants, and collects his own rents. . . . The conditions were very binding upon the tenants. I should judge they were what I used to term when I made leases an iron-clad lease. Mr. Coburn in those leases has safeguarded his interests in every imaginable way. . . . In one sense of the word he is a very careful business man in his dealings there with his tenants and in other business transactions."

N. J. Perry testified that he had known appellant off and on for twelve years. He did not pretend to be an intimate acquaintance, or testify as to his mental sanity. In cross-examination he said that he could not state that appellant is in such a condition physically that he is not able to take care of himself; that appellant "has a great deal of property over there, a great many tenants, makes a great many leases, has a great deal of rent to collect at different times. He drives around, sometimes the old man Upton with him, and at other times I think Miss Upton goes out with him. . . . I have said before, in the way that Mr. Coburn has expressed himself to me, I believe that he is lacking in vitality; that is all."

Manuel Goulart testified that he had known appellant since 1882, and in his opinion appellant was not competent to manage his property. In cross-examination he said however, "All the business that I have done has been with Mr. Coburn. I have leased some land from him. I leased land last year from him, and had my dealings with him direct. I found him able at that time to transact the business with me. . . . The business was transacted satisfactorily to both sides, that is, I leased some land, and we agreed upon the rental, and Mr. Coburn agreed upon the amount I should pay. I rented a ranch for cash rent, and another piece of land I had on shares.''

Gehiel Coburn, a brother ten years younger than appellant, testified that in his opinion appellant was not competent to manage his business. It appeared, however, in cross-examination that the witness had sawed wood for appellant, but evidently the alleged incompetent was the one who could pay the unsuccessful witness for sawing wood. This witness admitted that he took part in trying to have a guardian appointed for appellant some nine years ago. He further testified: "I then testified that Mr. Coburn was incompetent. The result was that he was proven not incompetent. . . . So far as Mr. Loren Coburn's ability to get about is concerned he is about as active and spry now as he was eight or nine years ago. He appears to be around. I only see him occasionally, you know. I notice no material difference so far as his being able to get about is concerned, only he goes a little lame more than he used to, bent over. . . . As to his habits of living, Mr. Coburn, I don't know that he dissipates. I don't think that he uses intoxicating liquors. . . . He does not use tobacco in any form. I think he leads a regular life so far as that is concerned. He has no bad habits of any kind that he needs the appointment of a guardian for.''

This presents the substance of all the evidence offered by petitioner as to mental incompetency. There is nothing to show that appellant is incapable of taking care of himself. There is but the mere opinion of a few witnesses as to appellant being incompetent to take care of his property, and these opinions are worthless because not based upon any facts or reasons.

On the other hand, appellant presented the evidence of many of his neighbors as to his mental and physical compe-

tency. We have not space to give even a synopsis of that testimony, but that of James Moffitt, the cashier of the First National Bank of San Francisco, is a sample. Mr. Moffitt testified: "I know Loren Coburn of Pescadero; have known him seven or eight years. He is a patron of our bank. He has been such for approximately that time, a little more or less. I have known him in connection with the bank during that time, during which time I have frequently met him in business. . . . I don't know his age exactly. I suppose generally he must be well over the seventy-year term, and he always struck me as a man of remarkable physical strength. I have had business relations with him concerning his affairs and his relations to the bank, and have had an opportunity during those business operations of forming an opinion as to whether he was mentally competent. My opinion with reference to his competency or otherwise, as the management of his own affairs is, that he is absolutely competent. I think he is as well competent to manage his own affairs and look after his side of the bargain as anyone I have come in contact with in the bank for the last ten or fifteen years—that is, that he can take care of his side of the bargain."

Dr. Robertson, a physician of standing and an alienist of experience, carefully examined appellant, and testified as to his health, both mental and physical, as follows: "Mr. Coburn, so far as I could judge, is an absolutely healthy man. . . . I could hardly believe that a man eighty-two years old could have the apparent physical vigor that this man does. For instance, upon handing him a paper to read I found he didn't use glasses at all. I am barely turned fifty, and yet I find glasses an absolute necessity. I find his hearing in good condition; I found his heart in normal position and condition; I found no evidence of any change of circulation in the brain such as we expect to find in a man over fifty. As a matter of fact, in nothing that I examined, in no statement that he made to me, did I find anything other than a normal individual, either mentally or physically. . . . Mr. Coburn's whole life has been one of money, the acquisition of money, the handling of money and distribution of money; all in the world that he thinks of apparently—his one ambition in life is to acquire money, to hold property and to fight for what he believes is right. He has a keen sense of justice apparently—at least justice so far as it relates to him and other people. He told

me for instance, if he was deprived of his rights, and had to go to any guardian, and wanted a four-bit meal, and he handed him two bits, and told him to get a dinner with that —the old man held out his hands in horror, expressing absolute disgust.''

The appellant took the stand in his own behalf, and there is nothing in his long examination that even tends to show mental incompetency. No one could read the testimony without being impressed with his keen grasp of business details. Part of his testimony is as follows: ''I pay my bills—I deal altogether in cash—no long tails about it. If I go to a man in Pescadero and get anything from the grocery, $2.50, 'Here is your change, give me a receipt for it.' And if I have men working for me, I propose to pay them off every month, so as not to have any back arrangements, and if there is any entanglement or anything, we have to refer back only one month. I haven't got no partners; I ain't in any stock because I have got all the stock in my corporation myself. . . . Well, I go to bed from 8 to 9 o'clock; I have no chance—no use for this off to theaters and gambling places and taking a drink and having a great time. I never do anything of that kind. When I get through my work at night I go into my house. I have a fireplace, and build a fire, sit down, warm my feet, rest myself up, and about 8 or 9 o'clock I go to bed; sometimes it over-runs that, when I have something quite particular to attend to, and I don't get to bed until 10 or 8 or 9, but as a general rule I go to bed about half-past 8 or 9, and get up in the morning from 6 to 7, and when I am up around I have something to attend to, and the folks that know me they know that I am out around attending to business.''

His description of meeting Azro Coburn at the Jefferson Hotel in San Francisco is as follows: ''He wanted me to go up and see him. I went up there and saw him a few minutes, and he commenced to talk about my property, and I thought that was queer about his talking about my property; I thought he had better take care of his own property at home, and I was competent to take care of my own property—to come about three thousand miles to take care of my property. I said, 'What is the matter with you?' 'Well,' he said, 'I will tell you, you are in litigation over some timber land here.' 'Well,' I said, 'what of it?' '.Well,' he said, 'don't you think

you had better seek a compromise and settle up?' 'Well,' I said, 'I haven't got nothing to compromise.' 'Well,' he said, 'I think you had better; they may beat you,' and all that. I said, 'I don't know how they are going to beat me; they have no cause of action.' "

We are fully aware that an appellate court will not reverse a finding if there is a substantial conflict in the evidence; but the evidence, in order to raise a conflict, must be such as to present a fair and reasonable ground for a difference of opinion. The finding or verdict must have meritorious support in the evidence. A few general statements without substantial reasons is not sufficient to raise a conflict. (*Smith* v. *Belshaw*, 89 Cal. 427, [26 Pac. 834]; *Field* v. *Shorb*, 99 Cal. 662, [34 Pac. 504].) In the latter case it was sought to have a gift of personal property set aside at the suit of an administrator, on the ground that the decedent, at the time of making the transfer, was of unsound mind, and the jury found that the mind of the decedent was sound up to within three days of the making of the transfer, and from that time on was unsound. The court held that the finding of the jury as to unsoundness of mind at the date of the transfer was without sufficient support in the evidence, and therefore set the verdict aside.

The court erred in allowing several witnesses to testify, under the objections and exceptions of appellant, as to their opinions as to "the ability of appellant to manage his property," and "as to whether or not in their opinions he was likely to be imposed upon by designing parties." The opinions of the witnesses upon these questions and as to these matters were clearly inadmissible. The code provides (Code Civ. Proc., sec. 1870, subd. 10) that evidence may be given upon the trial of the following facts: "The opinion of a subscribing witness to a writing, the validity of which is in dispute, respecting the mental sanity of the signer, and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given"; and in such case the reasons upon which the opinion is based must be given, and the opinion itself can have no weight other than that which the reason brings to its support. (*Estate of Dolbeer*, 149 Cal. 227, [86 Pac. 695].)

The opinion as to the mental sanity of a person is one thing. His opinion as to whether or not he is competent to properly

attend to his business, or whether he is likely to be imposed upon is quite another and different thing. (*Shapter* v. *Pillar*, 28 Colo. 209, [63 Pac. 302].) It was there said: "Applying these rules, it is manifest that the opinions of the witnesses regarding the incapability of the plaintiff in error to manage and control his own business affairs should have been excluded. Those who had seen and conversed with him could properly give their opinion on the question of his insanity, but the vital one, i. e., the degree of his mental incapacity in that account, and the extent to which he may have been incapacitated thereby from managing his business, the jury should have determined from all the evidence on the subject. It was not a question which required peculiar skill or knowledge to comprehend; it was one which men of ordinary, average intelligence, after being acquainted with the hallucinations, if any, of plaintiff in error, his acts and thoughts prompted thereby, could ascertain for themselves, based upon their own experience and observations."

In the *Estate of Taylor*, 92 Cal. 564, [28 Pac. 603], it was held that the opinion of a witness as to the capacity of a testator to make a will was not admissible, the court holding that such opinion was quite different from an opinion as to mental sanity.

The orders are reversed.

HALL, J.—I concur in the judgment, but am unable to agree with what is said in the opinion of the presiding justice as to the insufficiency of the evidence to support the finding that appellant "is incapable of taking care of himself and managing his property." The evidence upon this point is not as satisfactory as it might be, and if the members of this court were sitting as trial judges, it is quite possible, or even probable, that we would not have come to the same conclusion as to the ultimate facts as that arrived at by the trial court. But this is not the test applied in this court upon an appeal. If the findings attacked are supported by any substantial evidence, the findings of the trial court are conclusive upon this court.

I agree with what the presiding justice has said in regard to the action of the trial court in allowing witnesses to give their opinions as to whether or not appellant had the ability to manage his property. By this testimony witnesses were

allowed in effect to give their opinions upon the general merits of the case and as to the question directly in issue. This may not be done. (*Wilson* v. *Reedy,* 33 Minn. 503, [24 N. W. 191]; *McDonald* v. *State,* 128 N. Y. 18, [27 N. E. 358]; *Blum* v. *Manhattan Ry. Co.,* 1 Misc. Rep. 119, 20 N. Y. Supp. 722; *Davis* v. *Fuller,* 12 Vt. 178, [36 Am. Dec. 334]; *Morcy* v. *Sun Mut. Ins. Co.,* 11 La. Ann. 748; *Hoener* v. *Kock,* 84 Ill. 408; *Muldowney* v. *Illinois Cent. Ry. Co.,* 39 Iowa, 615; *White* v. *Bailey,* 10 Mich. 155.)

KERRIGAN, J.—I concur in what is said by Justice Hall.

A petition for a rehearing of this cause was denied by the district court of appeal on November 26, 1909, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 27, 1909.