[Civ. No. 41045. First Dist., Div. One. Oct. 6, 1977.]

JACQUELINE KATZ et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY
OF SAN FRANCISCO, Respondent;
CARL KATZ et al., Real Parties in Interest.

954

**COUNSEL**

Baker & De Ome, Ralph L. Baker, Goorjian & McCabe, Paul Mike Goorjian, Margaret C. Crosby, Joseph Remcho, Friedman & Sloan, Stanley J. Friedman, Howard, Prim, Rice,

Nemerovski, Canady & Pollak, Jerome B. Falk, Jr., Ann Brick and Fred H. Altshuler for Petitioners.

Charles C. Marson and Alan L. Schlosser as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Shapiro, Shapiro & Shapiro, Carl B. Shapiro, Sylvia Shapiro and Helen Shapiro for Real Parties in Interest.

## OPINION

**SIMS, Acting P. J.**—The proceedings reviewed below were instituted in this court on March 25, 1977, by a petition for extraordinary relief in the nature of prohibition and mandamus filed on behalf of five adults who were each the subject of a substantially identical order appointing a parent or both parents as temporary conservator of the petitioner.[1] They

---

[1] The orders each provide as follows: "The Petition of [named petitioner or petitioners] for appointment as temporary conservator[s] of the person of [named conservatee], having been filed, and the matter coming on regularly for hearing on March 8, 1977, Petitioner[s] and Conservatee were personally present and represented by counsel. The court having heard and considered the evidence and arguments of counsel and, after full hearing, good cause appearing therefor,

"IT IS HEREBY ORDERED that the Petition of [named petitioner or petitioners] for appointment as temporary conservator[s] of the person of [named conservatee] is hereby granted. IT IS FURTHER ORDERED as follows:

"1. Hearing on the permanent conservatorship or further proceedings shall be heard on April 27, 1977, at 10:30 a.m. All parties shall appear at that time without further notice.

"2. During the temporary conservatorship, Conservator, or conservatee's other parent [where both appointed, reads "one conservator"] shall be present with conservatee at all times;

"3. Conservatee shall have right to be visited by, and speak with his [her] counsel at all reasonable times;

"4. Conservatee shall have access to reading material of his [her] choice;

"5. Conservator shall have the right to choose the residence of conservatee, whether inside or outside the State of California. This provision shall be stayed until 5:00 p.m. on March 28, 1977, and conservatee shall remain in the jurisdiction of this court until that time.

"6. Temporary Letters of Conservatorship shall issue without bond upon petitioner's taking and filing the oath required by law.

"Done in open court this 24th day of March, 1977, and signed this 25th day of March, 1977."

The order, ostensibly made pursuant to section 2201 of the Probate Code, is expressly excluded from the scope of appealable orders by section 2101. It has been recognized

sought an alternative writ which, after hearing, would lead to a peremptory writ that would prohibit continuing the orders in force, or which, in the alternative, would prohibit the respective temporary conservators from subjecting their respective temporary conservatees to the process of "deprogramming." In response to a further prayer in the petition, and after reviewing opposition filed by the conservators, on March 28, 1977, we issued a stay, pending determination of the petition, which substantially modified the powers of the temporary conservators.[2]

The following day the petitioners sought an order to show cause directed against the alleged contempt of the order of this court by the conservators and others, and prayed for a suspension of the temporary conservatorships pending further order of this court. The conservators countered with a denial, alleged that two of the conservatees had requested deprogramming, and that associates of the conservatees were attempting to interfere with the conservators' control over the conservatees.

On March 30, the petitioners suggested the appointment of neutral, independent temporary conservators if the appointment was not vacated. The conservators sought to enlist the aid of deprogrammers to prevent harassment of themselves and their charges, and to establish the right of the temporary conservatees to talk to deprogrammers upon requesting such conversation in writing.

On March 31, the temporary conservators filed a request for an evidentiary hearing on the alleged contempt before any further stay was granted. For their part, the attorneys for the petitioners advised the court

---

that a petition for an extraordinary writ is the proper method to secure review of a nonappealable probate order. (See *Conservatorship of Smith* (1970) 9 Cal.App.3d 324, 327 [88 Cal.Rptr. 119]; and *Le Jeune* v. *Superior Court* (1963) 218 Cal.App.2d 696, 698 [32 Cal.Rptr. 390].)

[2]The order reads in pertinent part: "Pending determination of the petition for a writ of prohibition and mandate on file herein, and subject to the further order of this court, the orders of March 24, 1977 appointing temporary conservators in San Francisco County Superior Court Action Nos. [designating the five actions] are hereby stayed to the extent that such orders grant to the temporary conservators the authority and power to do more than provide for the temporary care, maintenance and support of petitioners.

"Further, the temporary conservators are ordered enjoined from using the services of any person or organization in an attempt to alter the religious beliefs of the temporary conservatees in any way. They are also ordered enjoined from removing the temporary conservatees from the jurisdiction of this court, and each temporary conservator is enjoined from requiring the temporary conservatees to meet with, talk to, or in any other manner come into contact with any person other than the temporary conservators if the temporary conservatees express the desire to avoid contact with such person."

that an amended petition would be filed; and, by a separate communication, they advised this court that the petitioner Underwood had filed a revocation of the appointment of her attorneys, the designation of an Arizona attorney as her attorney and a voluntary consent to a conservatorship with the superior court, but that they could not ascertain whether she had freely and voluntarily done so.

By amended petition filed April 4, 1977, the petitioners sought (1) a writ of habeas corpus releasing petitioners from the custody of the temporary conservators; (2) review of the proceedings appointing the temporary conservators by writ of certiorari, to the end that the orders be vacated; (3) relief by extraordinary writ to control the procedure at any hearing to appoint a permanent conservator;[3] and (4) costs of suit and reasonable attorneys' fees as provided in federal law. (Pub. L. No. 94-559 amending 42 U.S.C. § 1988.) An amicus curiae brief from the American Civil Liberties Union in support of the petition was filed. This court on April 5 then issued an alternative writ of mandate and order to show cause why a referee should not be appointed to hold a hearing on the contempt charges.

Meanwhile on April 5 the attorney for the temporary conservatees unsuccessfully sought an order vacating the temporary conservatorships in the trial court on the grounds the conservators had abused their powers as modified by the orders of this court. The conservators on April 8 filed their response to the new petition and the brief of amicus curiae; and on April 11, 1977, the matter came on for hearing.

At that time the attorneys for the petitioners filed their application for leave to withdraw as counsel for the petitioners Underwood, Brown and Katz, each of whom had executed documents similar to those previously filed by Underwood in the superior court. That application was granted; and the court took under submission the question of the dismissal of the petitions filed on their behalf with this court. In view of the instruments executed by those petitioners, the petition and amended petition for extraordinary relief must be dismissed insofar as they seek relief for

---

[3] The prayer reads that "a peremptory writ of mandate or prohibition issue under the seal of this Court commanding Respondent Court to refrain from holding hearings on or granting the petitions for appointment of permanent conservators absent probable cause to believe that—without regard to Petitioners' religious beliefs, affiliations, or activities—the statutory criteria for a conservatorship are present; prohibiting Respondent Court from taking evidence at any such hearing which relates to Petitioners' religious beliefs, affiliations, and activities; and compelling Respondent Court to require that proof be beyond a reasonable doubt and that the jury be unanimous; . . ."

those petitioners. Following argument the court stayed all five orders appointing a temporary conservator so as to enable each temporary conservatee to associate with whomsoever he or she might choose. There remained for consideration the questions of whether those orders should be peremptorily set aside, whether the court should outline the procedure for conducting a hearing for the appointment of permanent conservators for the two remaining petitioners, the disposition to be made of petitioners' charges that the conservators and their agents acted in contempt of the orders of appointment as restricted by this court's order of March 28, 1977, and petitioners' application for attorneys' fees.

Submission of those matters was deferred pending the preparation and filing of a reporter's transcript of the proceedings in the trial court. The record having been filed, and all matters having been reviewed we conclude that the proceedings are not moot, and entertain them as to the remaining petitioners.

In examining the contentions made in support of the petition we find that the former provisions of section 1751 of the Probate Code, which the temporary conservators relied upon in these proceedings, were too vague to justify the appointment of temporary conservators of the persons as granted herein; that the former statutes did not authorize the appointments, as made by the court, under the most favorable interpretation of the evidence; and that under the circumstances of this case it was a violation of the petitioners' rights to religious freedom to appoint temporary conservators of their persons under the provisions of the Probate Code.

The order to show cause for contempt must be discharged in the interests of justice, and petitioners' prayer for attorneys' fees is denied.

I

Preliminarily we are faced with the question as to whether any decision on the merits of the original orders of appointment has been rendered moot. As we have noted, the petitions attacking the order must be dismissed with respect to three of the petitioners and their respective temporary conservators. With respect to the remaining two petitioners the orders for appointment of a temporary conservator are still of record although modified and stayed by this court. Under the law in effect at the time of the proceedings in the lower court, the temporary conservatorship continues "pending the final determination of the court upon the

petition for appointment of a conservator." (Prob. Code, § 2201.)[4] Nevertheless we note that provisions governing the showing, circumstances and determination for appointment of a conservator have been drastically changed,[5] so that interpretation of the law in effect on March 25, 1977 may be of little precedental value.

The remaining parties and amicus curiae, however, have urged and insisted that the court rule on the remaining issues. Petitioners point out that even though certain facets of the case may have been resolved by

[4]Probate Code section 2201 provides: "On or after the filing of a petition for the appointment of a conservator, the court, with or without notice as the court or judge may require, upon a verified petition establishing good cause therefor, and filed by any person entitled under Section 1754 to apply for the appointment of a conservator, may appoint a temporary conservator of the person and estate or person or estate of any person (hereinafter called a conservatee) to serve pending the final determination of the court upon the petition for the appointment of a conservator under Chapter 2 of this division." Section 2206 formerly provided: "The appointment and qualification of a conservator terminates the powers of the temporary conservator except for the rendering of his account, unless by reason of an appeal therefrom or other cause the court appointing the conservator otherwise orders. If so ordered the court shall fix the time for the termination of the powers of the temporary conservator." (Stats. 1957, ch. 1902, § 1.)

By Statutes 1976, chapter 1357, section 35, operative July 1, 1977, section 2206 was amended to provide as above in subdivision "(a)." and by the addition of a new subdivision, reading: "(b) Except as provided in subdivision (a) the powers of the temporary conservator shall not extend beyond 30 days unless the court, with or without notice as it may require, for good cause shall extend such powers pending the final determination of the court upon the petition for appointment of a conservator."

[5]Probate Code section 1751 formerly provided: "Upon petition as provided in this chapter, the superior court, if satisfied by sufficient evidence of the need therefor, shall appoint a conservator of the person and property or person or property of any adult person who by reason of advanced age, illness, injury, mental weakness, intemperance, addiction to drugs or other disability, or other cause is unable properly to care for himself or for his property, or who for said causes or for any other cause is likely to be deceived or imposed upon by artful or designing persons, or for whom a guardian could be appointed under Division 4 of this code, or who voluntarily requests the same and to the satisfaction of the court establishes good cause therefor, or who is an absentee as defined in Section 1751.5. The court, in its discretion, may appoint one or more conservators." (Stats. 1957, ch. 1902, § 1, as amended Stats. 1972, ch. 988, § 3, eff. Aug. 16, 1972.)

By Statutes 1976, chapter, 1357, section 25, operative July 1, 1977, section 1751 was amended to read as follows: "Upon petition as provided in this chapter, the superior court, if satisfied by sufficient evidence of the need therefor, shall appoint a conservator of the person and property or person or property of any adult person who, in the case of a conservatorship of the person, is unable properly to provide for his personal needs for physical health, food, clothing or shelter, and, in the case of a conservatorship of the property, is substantially unable to manage his own financial resources, or resist fraud or undue influence, or for whom a guardian could be appointed under Division 4 of this code, or who voluntarily requests the same and to the satisfaction of the court establishes good cause therefor, or who is an absentee as defined in Section 1751.5. 'Substantial inability' shall not be evidenced solely by isolated incidents of negligence or improvidence. The court, in its discretion, may appoint one or more conservators."

releasing the petitioners from the custody of the temporary custodians, the Supreme Court has stated, ". . . if a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot." (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]. See also *People* v. *Feagley* (1975) 14 Cal.3d 338, 345 [121 Cal.Rptr. 509, 535 P.2d 373]; *In re Michael D.* (1977) 70 Cal.App.3d 522, 524, fn. 1 [140 Cal.Rptr. 1]; and *In re L.L.* (1974) 39 Cal.App.3d 205, 207 [114 Cal.Rptr. 11].) We therefore examine the validity of the outstanding orders, and the issues remaining on the contempt charge. We refrain from ruling on petitioners' prayer for directions concerning the procedure to be followed in connection with any hearing for a permanent conservatorship. We must assume that the trial court will follow appropriate law and procedure in the event such a hearing is held. The question of the probative effect of the religious beliefs, affiliations and activities of the proposed conservatee is, of necessity, discussed below as it bears on the appointment of a temporary conservator. The former's right to a jury trial is established by precedent, and by present statute. (*Le Jeune* v. *Superior Court* (1963) 218 Cal.App.2d 696, 698 [32 Cal.Rptr. 390]; Prob. Code, § 1754, as added Stats. 1976, ch. 1357, § 26, operative July 1, 1977.) The question of the burden of proof and the necessity for unanimity in the verdict of the jury where civil proceedings may result in involuntary confinement is presently in the bosom of our appellate courts.[6] We cannot, however, avoid the juxtaposition of present and past law where it throws light on our interpretation of the latter.

## II

We first examine petitioners' contention that the provisions of section 1751 of the Probate Code (fn. 5 above), under which these proceedings were instituted were unconstitutionally vague. Those provi-

---

[6]See *Conservatorship of Johnson* (Cal.App.) vacated by hearing granted March 17, 1977, Supreme Court No. L.A. 30572; *Conservatorship of Roulet* (Cal.App.) vacated by hearing granted February 3, 1977, Supreme Court No. 30730; and *Conservatorship of Turner* (Cal.App.) vacated by rehearing granted February 8, 1977, 1 Civil No. 38400, division 2. The foregoing cases deal with the provisions of subdivision (d) of section 5350 of the Welfare and Institutions Code, involving conservatorships for gravely disabled persons. Nevertheless under current law a comparison of the provisions of sections 5357 and 5358 of the Welfare and Institutions Code (powers of conservator/placement of conservatee) with sections 1851, 1852 and 1853 of the Probate Code (care, custody and control of conservatee/general and additional powers of conservator) indicates that any involuntary treatment must be provided under the former sections. (See text below.)

sions must furnish guidance for the determination of the "good cause" required by section 2201 (fn. 4 above) which authorizes the appointment of a temporary conservator. The record reflects that the petitions for appointment were entitled "Application For Appointment Of A Guardian (Conservator) Of The Person." Each alleged in pertinent part: "The appointment request for the proposed ward is required because of mental illness or weakness and unsound mind. The proposed ward is unable to property [*sic*] care for the person or the property of the proposed ward and is likely to be deceived by artful and designing persons."

Simultaneously the parents each filed an "Application For Appointment Of Temporary Guardianship (Conservatorship) Of The Person And For The Powers To Remove Said Person From Custody Of A Certain Group And Place With Petitioner." Each application alleged in pertinent part, "[T]he proposed ward is 21 years old. The appointment for a temporary guardian of the person until a permanent guardian is appointed is necessary because Petitioner is informed and believes and thereon alleges, that said proposed ward is deprived of the ability to manage his person, is likely to be deceived by persons of artful and cunning design, and is in grave need of immediate psychiatric or other counseling"; and "The temporary Guardian of the person should be given powers to take said proposed ward into personal custody, and then examined by a physician of the temporary guardian's choice, including, but not limited to, psychiatrists, psychologist social workers, lay persons, etc., and to resist any attempts by the proposed ward or others to remove said proposed ward from proposed Guardian's care."[7] The petitions all

[7]The applications for appointment of a temporary conservator were each accompanied by the following declaration: "I HEREBY DECLARE that:

"I am the natural parent of the proposed ward.

"That during 1976, my child, the proposed ward, became involved with an association known as the Unification Church, headed by Rev. Sun Myung Moon.

"Based on my contacts with my child before and after the involvement with this group, and the changes I have observed in my child, I am concerned that my child is not now acting on free will, and that both the physical and mental health of the proposed ward are impaired. I am informed and believe and thereon allege that this is due to psychological pressures on my child in the present environment, and that these pressures are intentionally produced as part of a system of mind control that is imposed upon the proposed ward by the Cult.

"In summary, that since the proposed ward's involvement with this Cult, during the above-mentioned period of time the following changes have taken place:

"1. Abrupt personality changes;

"2. Assets the proposed ward acquires is [*sic*] or has been [*sic*] transmitted to the

alleged and the record reflects that the petitioners in this matter were all adults over the age of 21 years.

We therefore are concerned only with those former provisions of section 1751 which provided that the court "shall appoint a conservator of the . . . person . . . [first] of any adult person who by reason of advanced age, *illness,* injury, *mental weakness,* intemperance, addiction to drugs or other disability, *or other cause* is unable properly to care for himself or for his property, or [second] who *for said causes or for any other cause is likely to be deceived or imposed upon by artful or designing persons."* (Italics added.)

The court's orders following the hearing (fn. 1 above), contain no findings of fact which would disclose the ground or grounds on which the orders were based. In announcing its decisions the trial court gave no clue to what facts he considered were established by the evidence.[8] The petitioners point out that there is nothing to show that the petitioners were unable to care for themselves, and that there was only limited evidence to show that care of property was involved, and that issue was not directly raised. They conclude that the appointments must stand, if at all, on the second ground, and that it is unconstitutionally vague as applied in the circumstances of this case.

---

leaders of the group.

"3. My child appears to be the victim of mind control through hypnosis, mesmerism, and/or brain washing."

In one of the conservatorships, an ex parte order was issued without notice, appointing the parents temporary conservators of the person of their daughter. The court found "that the proposed conservatee is unable properly to care for herself or for her property and is likely to be deceived or imposed upon by artful and designing persons, . . ." The order of appointment, which was limited to 30 days, also provided: "The Conservator shall have the right to choose appropriate living arrangements for his or her conservatee. Placement out of the State of California is authorized."

No such order was executed, and the matters came on for hearing on March 9, 1972, on the applications for temporary conservatorships for a 30-day period.

[8]The court stated: "It's not a simple case. As I said, we're talking about the very essence of life here, mother, father and children. There's nothing closer in our civilization. This is the essence of civilization. [¶] The family unit is a micro-civilization. That's what it is. [¶] A great civilization is made of many, many great families, and that's what's before this Court. It's not the regular run-of-the-mill case that involves some money, or some kind of damage. It is the very essence of life."

In ruling on the petitioners' requests for restrictions on the order, it added: "One of the reasons that I made this Decision, I could see the love here of a parent for his child, and I don't even have to go beyond that. Even our laws of this State, the Probate laws have all been set up—the laws of succession, children succeed to the estate of their parents if the parents die intestate. [¶] So the law looks at that binding thing between a parent and a child. It is never-ending. No matter how old we are, it's there. And that was one of the things that influenced this Court."

We are mindful that similar provisions first became a part of our law over 85 years ago when section 1767 was added to the Code of Civil Procedure reading, "The phrase 'incompetent,' 'mentally incompetent,' and 'incapable,' as used in this chapter, shall be construed to mean any person who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause, unable, unassisted, to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons." (Stats. 1891, ch. 76, § 1, p. 68.)[9]

They have been frequently recognized. The constitutionality of the provisions was upheld against attack, on grounds other than that asserted here, in *Matter of Coburn* (1913) 165 Cal. 202 [131 P. 352]. (See pp. 209-212.) The court there stated, "Adopting the view, then, that section 1767 is a valid enactment, there can be no occasion to go beyond its terms to learn what conditions will justify the appointment of a guardian. The grammatical construction of the section is not above criticism, but defects in this respect, while they may enhance the difficulty of interpreting the enactment, do not impair its binding force. The test established by the section is whether or not the person in question is 'unable, unassisted, to properly manage and take care of himself and his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons.' This broad language must, we think, be read in the light of the other provisions of the chapter of which section 1767 is a part, and particularly of section 1763, which lays down the initial steps to be followed in seeking the appointment of a guardian. The petition must represent that the person is insane, or from any cause *mentally* incompetent to manage his property, and we take it that the inability defined in section 1767, although not expressly so

---

[9]Similar language was carried forward into section 1460 of the Probate Code which provided in part: ". . . As used in this division of this code, the phrase 'incompetent person,' 'incompetent,' or 'mentally incompetent,' shall be construed to mean or refer to any person, whether insane or not, who by reason of old age, disease, weakness of mind, or other cause, is unable, unassisted, properly to manage and take care of himself or his property, and by reason thereof is likely to be deceived or imposed upon by artful or designing persons."

By Statutes 1976, chapter 1357, section 5, operative July 1, 1977, the latter part of the section was revised to read: ". . . As used in this division and Division 5 [Conservatorship] of this code, the phrase 'incompetent person,' 'incompetent,' or 'conservatee' shall mean a legal, not a medical disability and shall be measured by functional inabilities. It shall be construed to mean or refer to any adult person who, in the case of a guardianship of the person, is unable properly to provide for his own personal needs for physical health, food, clothing or shelter, and, in the case of a guardianship of the estate, is substantially unable to manage his own financial resources. 'Substantial inability' shall not be evidenced solely by isolated incidents of negligence or improvidence."

limited, must be understood to mean a mental, rather than a physical inability. It is, under the section, immaterial how such inability has been produced. It may result from 'old age, disease, weakness of mind, or from any other cause.' " (165 Cal. at p. 212. Cf. *Estate of Dopkins* (1949) 34 Cal.2d 568, 577-578 [212 P.2d 886] [appointment for physical incapacity]; and *Hillman* v. *Stults* (1968) 263 Cal.App.2d 848, 872-874 [70 Cal.Rptr. 295] [prison inmate].)

With respect to the appointment of a guardian of the person, the *Coburn* court stated: "The main purpose of the statute is the protection of property [citation] and we think the legislative view was that the inability to take care of himself necessarily results from the determination that the person is 'insane, or from any cause incompetent to manage his property.' In other words, the care of one's self means, not merely attention to the physical needs of the body, but that control of one's actions and conduct which is exercised by a normal mind." (165 Cal. at pp. 216-217.)

In *Guardianship of Cookingham* (1955) 45 Cal.2d 367 [289 P.2d 16], the court upheld the guardian's right to reimbursement for expenses incurred in unsuccessfully resisting the ward's petition for restoration to capacity. The court said, "The guardian could not assume merely from his ward's discharge and subsequent petition for restoration that he was capable of taking care of himself. [Citation.] To discourage the guardian's inquiry as to the ward's status, in effect, would allow the petition for restoration to be considered without the presentation of all of the facts. But the purpose of the law is to protect a ward from being 'deceived or imposed upon by artful or designing persons' (Prob. Code, § 1460), and court must scrupulously protect the rights of persons whose competency is in question." (45 Cal.2d at pp. 371-372.)

*In re Zanetti* (1949) 34 Cal.2d 136 [208 P.2d 657], noted the difference between the provisions of the Probate Code and the Welfare and Institutions Code, and ruled that the discharge of a guardian under the former provisions did not constitute a restoration to capacity under the latter. The court said, "Proceedings pursuant to the provisions of the Probate Code (see § 1460, quoted above) are designed to protect an incompetent who is for any reason mentally incapable of taking care of himself and of his property. The incompetency determined here need not be the result of insanity, e.g., 'mental illness,' and no confinement is contemplated. Protection of the incompetent from others is the main purpose of the statute. [Citations.]" (34 Cal.2d at p. 143. See also

*Guardianship of Mosier* (1966) 246 Cal.App.2d 164, 174 [54 Cal.Rptr. 447].)

*In re des Granges* (1929) 102 Cal.App. 592 [283 P. 103], presented the opposite side of the coin. The court reversed a judgment terminating a guardianship solely because the ward had been adjudged sane and released in commitment proceedings in another state. The court stated: "It is the duty of the court to zealously guard the property of a person who has been declared to be insane or incompetent [citation], and upon a proceeding to restore such a person to capacity, to require proof not only of said person's sanity, but also of his ability to take care of his property, and that he is not likely to be deceived or imposed upon by artful or designing persons." (102 Cal.App. at p. 598.)

The courts have also recognized the right of an individual to control himself and his property. In *Estate of Schulmeyer* (1915) 171 Cal. 340 [153 P. 233], Justice Sloss stated, "Generally speaking, an adult person has the right to control his own person and affairs, and that right should not be taken from him, except upon a showing of the statutory grounds warranting a restriction of his liberty of action for his own protection." (171 Cal. at p. 342.) There he found sufficient evidence to come within the purview of former section 1767. Two years later, however, he applied that generality to reverse an appointment predicated upon insufficient evidence. (*Estate of Watson* (1917) 176 Cal. 342, 346 [168 P. 341].) A similar thought was expressed in *In re Coburn* (1909) 11 Cal.App. 604 [105 P. 924], as follows: "It is a fundamental principle, based upon the plainest dictates of justice, that before a person can be deprived of his liberty and his property on account of his mental incompetency, he must be brought clearly within the terms of the statute, and the evidence must show that his mind is so far gone and so weak and feeble that he does not realize and comprehend the value and prudent management of his property, and is not sufficiently normal to care for it in the usual acceptation of that term." (11 Cal.App. at p. 606.)

In *Board of Regents* v. *Davis* (1975) 14 Cal.3d 33 [120 Cal.Rptr. 407, 533 P.2d 1047], the court upheld the right of a conservatee to contract despite the fact that a conservator had been appointed for his estate. "The legislative history indicates that both the State Bar and the Senate Judiciary Committee intended that the new relationship achieve two major objectives. The first was the establishment of the conservatorship as an alternative to guardianship to avoid, as we have noted, the 'stigma' of the label 'incompetency.' In such a situation a conservator is merely

another linguistic designation for a guardian. [¶] The second objective of the new statute was to extend its embrace to those who would otherwise find themselves without legal protection. The Legislature achieved this objective by providing that the court could appoint a conservator for a person who was neither insane nor incompetent, but who, for a variety of other reasons, needed direction in the management of his affairs. Thus, clearly, the Legislature designed the conservatorship statute to cover a much more extensive category of eligible persons than the more limited guardianship law." (14 Cal.3d at pp. 38-39, fns. omitted. Cf. *Place* v. *Trent* (1972) 27 Cal.App.3d 526, 531-533 [103 Cal.Rptr. 841], as disapproved in *Davis.*)

The foregoing statement must be read in the context of the appointment of a conservator of a conservatee's estate. In *Conservatorship of Stewart* (1969) 276 Cal.App.2d 211 [80 Cal.Rptr. 738], the court stated, "The sole purpose of a conservatorship is to provide a competent person to act, under the guidance of the probate court, as the agent of the conservatee." (276 Cal.App.2d at p. 214. Accord: *Place* v. *Trent, supra,* 27 Cal.App.3d at pp. 530-531.) Though *Davis* tells us the conservatee, if competent, may contract too, it no less emphasizes the property aspect of the conservatorship.

In upholding the right to appoint a temporary conservator of the estate without notice to the conservatee, the court in *Conservatorship of Gray* (1970) 12 Cal.App.3d 513 [90 Cal.Rptr. 776], stressed the necessity of preserving the estate from loss or dissipation. (12 Cal.App.3d at p. 524.[10] See also *Conservatorship of Oliver* (1962) 203 Cal.App.2d 678, 684 [22 Cal.Rptr. 111].)

---

[10] "The appointment of a temporary conservator after the filing of the petition for the appointment of a conservator is in the nature of a provisional remedy granted before a hearing on the merits of the primary petition. Its sole object is to preserve the health and welfare of the alleged conservatee and to preserve his estate from loss or dissipation during the period of time between the appointment of the temporary conservator and the hearing on the primary petition for the appointment of a conservator. Many instances could arise where the alleged conservatee is about to lose his property through deceit imposed upon him by artful or designing persons. To wait for the service of a citation upon him and for a hearing on the petition for the appointment of a conservator to take over the estate and prevent such loss could thwart the very objects and purposes of the conservatorship law. Under these circumstances to first require the service of a citation on the alleged conservatee and the conduct of a hearing on the petition before the appointment of a temporary conservator would amount to a useless act if the estate of the conservatee was lost in the meantime." (*Conservatorship of Gray* (1970) 12 Cal.App.3d 513, 524 [90 Cal.Rptr. 776].)

It has been stated that in practice guardianship solely of the person is never utilized. (Pickering, *Limitations on Individual Rights in California Incompetency Proceedings* (1974) 7 U.C.Davis L.Rev. 457, 466, fn. 39, and accompanying text.) Experience has indicated that this is not necessarily so insofar as guardianships have been used to secure the custody of minors. We have no way of verifying the statement as applied to a guardianship or conservatorship solely of the person of an adult. In any event, we find no California authority on the extent such procedures, as distinguished from those authorized by the Welfare and Institutions Code, may be used to curb the freedom of action of an adult. (See part III below.)

We assume that there may be a difference between a restraint on the management of one's property, which does not dissipate or expropriate that property but merely seeks to preserve it, and a restraint on one's person. We are convinced that in the latter case the test of certainty must be that applied in the criminal law because fundamental rights are at stake.

*In re Gary W.* (1971) 5 Cal.3d 296 [96 Cal.Rptr. 1, 486 P.2d 1201], established that a juvenile was entitled to a jury trial before the court could direct his continued detention by the Youth Authority for treatment pursuant to sections 1800-1803 of the Welfare and Institutions Code. In upholding the right on due process and equal protection grounds, the opinion evaluated the procedures adopted to implement sections 1800-1803 in the light of other statutory provisions governing involuntary commitment. It stated, as is pertinent to the issues in this case, "The right to a jury trial in an action which may lead to the involuntary confinement of the defendant, even if such confinement is for the purpose of treatment, is no less fundamental [than the right to procreation, interstate travel and education]." (5 Cal.3d at p. 306.) It added, "In extending the right to trial by jury to other classes of persons subject to civil commitment proceedings, the California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*Id.,* p. 307. See also *People* v. *Feagley* (1975) 14 Cal.3d 338, 350 [121 Cal.Rptr. 509, 535 P.2d 373]; and *People* v. *Burnick* (1975) 14 Cal.3d 306, 318-321 [121 Cal.Rptr. 488, 535 P.2d 352].)

■ The classical statement of the requirements for statutes which provide for penal penalties on an individual is that found in *Connally* v. *General Const. Co.* (1926) 269 U.S. 385 [70 L.Ed. 322, 46 S.Ct. .126], reading: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (269 U.S. at p. 391 [70 L.Ed. at p. 328]. See also *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108-114 [33 L.Ed.2d 222, 227-231, 92 S.Ct. 2294]; *Coates* v. *City of Cincinnati* (1971) 402 U.S. 611, 614 [29 L.Ed.2d 214, 217, 91 S.Ct. 1686]; *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 597-604 [17 L.Ed.2d 629, 637-641, 87 S.Ct. 675]; *Giaccio* v. *Pennsylvania* (1966) 382 U.S. 399, 402-403 [15 L.Ed.2d 447, 449-450, 86 S.Ct. 518]; *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375]; *Katzev* v. *County of Los Angeles* (1959) 52 Cal.2d 360, 370-372 [341 P.2d 310]; and *McMurtry* v. *State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 766-773 [4 Cal.Rptr. 910]. Cf. *Old Dearborn Co.* v. *Seagram Corp.* (1936) 299 U.S. 183, 196-197 [81 L.Ed. 109, 120-121, 57 S.Ct. 139, 106 A.L.R. 1476]; *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 59-61 [216 P.2d 859]; *Wingfield* v. *Fielder* (1972) 29 Cal.App.3d 209, 217-220 [105 Cal.Rptr. 619]; *McMurtry* v. *State Board of Medical Examiners, supra,* 180 Cal.App.2d 760, 768 and 773; and *Smith* v. *Petersen* (1955) 131 Cal.App.2d 241, 245-250 [280 P.2d 522, 49 A.L.R.2d 1194].)

If the individual's fundamental rights are violated it is immaterial whether the statute or proceedings are civil or criminal in nature. (See *Giaccio* v. *Pennsylvania, supra,* 382 U.S. 399, 402 [15 L.Ed.2d 447, 449] and *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 231.)

In *Grayned* v. *City of Rockford, supra,* the court pointed out the important values which vague laws offend. "First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly

delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " (408 U.S. at pp. 108-109 [33 L.Ed.2d at pp. 227-228], fns. omitted.) ██ As applied in the present case an individual seeking salvation through religion or associating in a social or political cause cannot tell whether or not he will be placed in the custody of another on charges that he has been deceived by artful and designing persons. When such charges are laid, the court or jury in examining the precepts and associates selected by the proposed conservatee has no better standards under which to evaluate the latter's conduct. Finally, there may be severe inroads on the individual's freedom to practice his religion, and to associate with whom he pleases because of the threat of proceedings such as this.

Although the words "likely to be deceived or imposed upon by artful or designing persons" may have some meaning when applied to the loss of property which can be measured,[11] they are too vague to be applied in the world of ideas. In an age of subliminal advertising, television exposure, and psychological salesmanships, everyone is exposed to artful and designing persons at every turn. It is impossible to measure the degree of likelihood that some will succumb. In the field of beliefs, and particularly religious tenets, it is difficult, if not impossible, to establish a universal truth against which deceit and imposition can be measured.

It has been recognized that under the power of a conservator of the person to have the "care, custody and control of" and to "fix the residence" of the conservatee (Prob. Code, former § 1851), a conservator can effect virtual confinement of a conservatee without his consent in a

---

[11]It is generally recognized that "there must be something more than poor business judgment to establish incompetency." (*Guardianship of Waite* (1939) 14 Cal.2d 727, 731 [97 P.2d 238]; see also *Estate of Watson, supra,* 176 Cal. 342, 345; and *Estate of Baldridge* (1959) 122 Cal.App.2d 752, 755 [266 P.2d 103].)

Shakespeare tells us, "Who steals my purse steals trash; 'tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed." (Othello, act III, scene 3.)

The same comparison may be drawn with a theft of one's beliefs, be it by "coercive persuasion" (part II), or summary legal action.

private facility. (Johnstone, et al., Cal. Conservatorships (Cont. Ed.Bar Supp. 1976) § 5.6, p. 51, but cf. § 1851, as amended Stats. 1976, ch. 1357, § 29, operative July 1, 1977; see part II below.)[12] A commentator has stated, "The guardianship statute [Prob. Code, § 1460] clearly fails to provide adequate guidelines for the reasoned application of the law. That guardians are, in fact, not appointed 'for almost any unsuccessful person' can be credited only to the restrained exercise of sound judicial discretion." (Pickering, *op.cit., supra,* 7 U.C.Davis L.Rev. at pp. 484-485, fns. omitted. See also 3 Condee, Cal. Practice, Probate Court Practice (West 2d ed. 1964) § 2289, p. 327, re Prob. Code, § 1751; and *id.* (3d ed. 1977) Goddard, § 2292, p. 448.)

In view of the values involved we conclude that the provisions of section 1751 as it read prior to July 1, 1977, were too vague to be applied in proceedings to deprive an adult of his freedom of action as proposed by the parents in this case. If there was mental deterioration, proceedings under the Welfare and Institutions Code were available. If there was duress or physical restraint criminal sanctions should have been sought.

### III

█ If the provisions are not too vague to permit the appointment of a guardian of the person, the question remains as to whether they were properly applied in this case. The hearings on the petition for the

---

[12]Section 1851 formerly provided: "Every conservator of the person of a conservatee has the care, custody and control of the conservatee and may fix the residence of the conservatee at any place within this State, but not elsewhere without the permission of the court."

As amended effective July 1, 1977, the following provision was added: "No person for whom a conservator of the person has been appointed shall be placed in a mental health treatment facility against his will. Involuntary civil mental health treatment for a conservatee shall be obtained only pursuant to the provisions of Article 1 (commencing with Section 5150), Article 1.5 (commencing with Section 5170), Article 2 (commencing with Section 5200), Article 3 (commencing with Section 5225), Article 4 (commencing with Section 5250), Article 4.5 (commencing with Section 5260), Article 5 (commencing with Section 5275), Article 6 (commencing with Section 5300), Article 7 (commencing with Section 5325), Article 8 (commencing with Section 5340), and Chapter 3 (commencing with Article 5350) of Division 5 of the Welfare and Institutions Code. . . ." The articles referred to respectively deal with "Detention of Mentally Disordered Persons," "Detention of Inebriates for Evaluation and Treatment," "Court-Ordered Evaluation for Mentally Disordered Persons," "Court-Ordered Evaluation for Persons Impaired by Chronic Alcoholism or Drug Abuse," "Certification for Intensive Treatment," "Additional Intensive Treatment of Suicidal Persons," "Judicial Review," "Postcertification Procedures for Imminently Dangerous Persons," "Legal and Civil Rights of Persons Involuntarily Detained," "Community Drug and Narcotic Treatment Services," and "Conservatorship for Gravely Disabled Persons."

appointment of temporary conservators started seriatim; they were shortly thereafter consolidated. It therefore is necessary to consider the evidence taken with respect to some of the recanting petitioners to fully appraise the case with respect to the remaining two. The case was heard for over two weeks and resulted in a reporter's transcript of almost 1,700 pages. The parents offered the testimony of the mother and father of one of the proposed conservatees who later recanted. It was stipulated that the declarations of the other parents would be received in evidence. (See fn. 7 above.) They also produced two former members of the Unification Church, and a psychiatrist and a psychologist. Each of the proposed conservatees, the original petitioners here, testified in opposition to the petitions, and a psychiatrist, a psychologist, and two persons who had been subjected to deprogramming testified on their behalf.

Without the benefit of compliance with California Rules of Court, rule 983, the court, on a motion of local counsel for the parents, there being no objection, permitted two Arizona attorneys to join in presenting the case. The framework of the case was announced in the opening statement as follows: "Our goal here is, of course, to obtain temporary conservatorships of five young adults for a period of thirty days . . . [¶] I think each of them are in the courtroom here today, sitting near their parents. [¶] Our contention, our allegation and our proof will demonstrate that these young adults, individuals, are the victims of artful and designing persons, that is to say, specifically of the leadership of the New Educational Development which is a front organization for the Unification Church. [¶] The factors which will be demonstrated through this proceeding are that the following items have been utilized on these young individuals to one extent or another, at one time or another during this programming: Food deprivation; sleep deprivation; isolation; the use of fear tactics; the use of guilt feelings, and indoctrination, the same tactics used on our prisoners of war during the Korean War crises. [¶] As a loose definition of what these items constitute, it is oftentimes referred to as 'coercive conversion' or 'thought reform,' or commonly referred to as 'brainwashing,' which of course is a very elusive term in our society today because of the quantitative and qualitative nature of brainwashing—. . . [¶] It is our position that the proof will demonstrate that these people are victims of artful and designing persons due to coercive conversion which is oftentimes referred to as thought control, thought reform, or brainwashing. [¶] As a loose definition of what I referred to by the word 'brainwashing' or 'coercive conversion' I mean generally, and it will be more specifically explained by the medical personnel which we will present, as being basically behavior of an individual, determined not

by his own internal decision, but rather by coercion from outside forces, and specifically in this case, through the use of fear and guilt tactics. [¶] The facts we will prove are that these five young adult individuals are victims of artful and designing persons. . . . [¶] In terms of solution our evidence, specifically through our medical personnel, will indicate that the solution to this problem lies in reality-inducing therapy which consists of adequate food, sleep, books to read on coercive persuasion, and the ability to have opportunities to speak with former cult members. . . . [¶] Additionally our evidence will show these young people are victims of psychological kidnaping, and that basically for the most part they are young, idealistic and naive individuals. [¶] There is no crime against brainwashing, and this [is] why we have turned to this Court. And our evidence will show even the initial recruitment of these individuals was through deceit."

The father of petitioner Underwood, who has recanted, testified to personality changes in his 25-year-old daughter during the four years she had been a member of the Unification Church. He stated: "Her demeanor was quite different than it had been before. [¶] Whereas before she was open and curious and very interested in all kinds of ideas, political and social, she was no longer, after she was in the movement, interested in all those things. [¶] She became somewhat child-like in her belief and acceptance of this unitary system of beliefs, and her interests were almost totally devoted to that system of beliefs, to the exclusion of virtually all else, and she had had very broad interests before. [¶] So her demeanor was, I would say, child-like, broad, somewhat artificially cheerful I felt at times in making the best of everything, whereas before she felt free to be somewhat critical of things that impinged on her life adversely." He also noted a change in her cultural interests, hobbies, in her vocational goals and objectives, in her participation in civic activities, and in her voice which became high-pitched rather than hoarse. He opined that she was being imposed upon because she was devoting all her time, many hours a day, to raising funds for the movement without receiving any compensation personally other than minimal food and a place to put down a sleeping bag.

On cross-examination he acknowledged that his daughter looked healthy at the hearing, and had always appeared to be when they had visited in the previous year. He further stated: "I think she has her own mind, but I think it is controlled like someone under hypnosis; and in certain areas, she cannot function as an independent human being."

Mrs. Underwood testified in similar vein regarding the changes in her daughter's personality. She opined that her daughter was incapable of freely arriving at a decision.

A former member of the Unification Church testified that he joined while a student at the University of California in Berkeley; that he was at times a director of the church seminar and training camp in Booneville, manager of its coffee restaurant in Oakland, and a staff member of the Bay Area Unification Church and its affiliated New Ideal Development; and that he had been a leader of fund raising teams in Berkeley and around the country. He stated that he left the church in December 1976, following a temporary conservatorship in which he experienced therapy counseling which enabled him to see certain deceptive practices of the Unification Church. He explained the treatment he received. He opined that previously he would not freely have chosen to leave because when he had any doubts about the group, he was taught to and did attribute it to his inability to do or appreciate what was right.

He stated he became interested in the group in response to representatives of what purported to be "International Ideal City Project," and only later found out it was a religious organization and was known as the Unification Church. Among the other practices of which he complained were peer pressure; negating the value of the individual so that identity existed only in relationship to the group; a tremendous polarization of thinking to see the world in terms of good and evil, with goodness existing only within the confines and actions of the group itself, and everything outside evil and Satanic. He referred to tactics of "mind control" which he defined as "a situation where a set of beliefs or doctrines are imposed upon a person through a process of either isolation or force, or using tactics of fear and guilt to impose these ideas on a person so they become unquestionable or unimpeachable." The witness testified that the daily objectives of the group were to make money and bring in new members. He acknowledged that the overall objectives of the Unification Church were to establish a heavenly kingdom on earth, to obtain all the worldly material so Reverend Moon has all the power and wealth of the world in his hands.

He explained the arduous routine followed by fund raising teams—from 7 a.m. to 1 a.m., six days a week. The court refused to permit inquiry regarding what the church did with its collection. He testified that "New Educational Development" was another offshoot of the church and that such names were used to overcome the reluctance of

some prospects to at first attend dinners or seminars held by the church. According to him he worked long hours to raise money to pay for various facilities the Unification Church was purchasing throughout the country, large training centers, large estates, beautiful homes, and personal jewelry, fur coats and cars for the leaders; and that he was under emotional and psychological pressure to fulfill a responsibility to make money for the Reverend Moon and the Unification Church in order to establish a heavenly kingdom on earth. He felt compelled to follow the religious and political teachings of Reverend Moon.

A second former member of the church from 1972 to 1976 testified that he directed church operations in the State of Pennsylvania in 1973, was lecturer on the staff of the Tarrytown, New York Center in 1974-1975, and assistant director of planning and development for the Unification Church Seminary in 1975, where he had been a student and teaching assistant responsible for recruiting faculty and teaching them some of the ideas of the movement. In 1976 he worked as editor of a propaganda magazine known as "New World." He was among the hierarchy on the East Coast. He left the church because after a court proceeding he learned facts about the church and the techniques of mental subversion that had been practiced on him. At the time of the hearing he was the director of the Freedom Ranch Rehabilitation Center of the Freedom of Thought Foundation at Tucson, Arizona.

He explained these techniques as follows: A very strong isolation of the individual from his home, from his friends, and even from his own mind; a completely structured program from 7 a.m. to 12:30 or 1 a.m. at night; every single activity a person engaged in—including washing, exercising, eating, going to lectures, participating in sports—was done by a group, and a person was given no free time whatsoever; an intense schedule and a deluge of religious concepts which left the participant confused and too fatigued at the end of the day to reflect on the day's activities and lectures; a limited amount of sleep and food which left the participants sluggish; and the inculcation of a feeling of personal guilt if the participant doubted or failed to follow the teachings.

He explained the deprogramming routine and acknowledged that those subjected to it were told that they could not leave and should stay and listen to the deprogrammers.

The psychiatrist, who jointly with a psychologist examined the proposed conservatees on behalf of the petitioning parents, testified that

he took a history from the parents and from the individual examined, and based his findings on those histories and his observations in the course of an hour and a quarter or so interview and confrontation with the subject. His findings, to which he also testified, were incorporated in a written statement prepared at the request of the attorney for the parents to determine in his opinion if five members of the Unification Church were under the influence of coercive persuasion which would render them vulnerable to artful and designing persons. It reads:

"It is my opinion that all five of these well-meaning, well-intentioned young people—Jan Kaplan, Leslie Brown, John Hovard, Jacqueline Katz and Barbara Underwood—have several symptoms which are not present in the average individual of their ages and background.

"During my interviews with them, it was as though these individuals responded to a pre-set (i.e., there was an effort made to answer all questions out of a limited set of answers). This limited set of answers appeared to be alien or inconsistent with those of their non-cult peers.

"They all suffered from gross lack of information regarding current events; they all seemed to be preoccupied with a concern about their selfishness, but all reported that they worked as much as twenty hours a day.

"They all showed a moderate degree of memory impairment, especially about their childhoods; their functional vocabulary in terms of the words that they used during the interview was limited and constricted.

"Their affects were blunted, emotionality frozen in a child-like inappropriate smile to all input, whether it be hostile or otherwise.

"They were all wide-eyed, had short attention spans and a decreased ability to concentrate.

"They were all vague, with limited ability towards abstractions; they were full of inconsistencies, contradictions and confabulations when pressured.

"They uniformly held that the Unification Church was not responsible for anything unless it was positive.

"They had very little concern for previous and future personal goals; they were paranoid about previous relationships, and had defensive attitudes toward id urges.

"Their inner sense of authority was lost, and all responded as if they were influenced by an outside authority.

"They all showed various degrees of regression and child-like attitudes, especially when stressed.

"In general, they did not respond as one would expect from their background and personality types."

He further stated that the symptoms he found were the result of "coercive persuasion." He explained that by "coercive persuasion" he meant a series of techniques principally introduced to this country by the prisoners of war who returned from the Korean War and the Vietnamese conflicts; and that is a term used by professionals to explain what the laymen call "brainwashing." He stated that it is the result of a systematic ritualistic procedure that people undergo who usually are in captivity, until they basically take on the identity of the individuals that they are around; that the captor or dominant individual reinforces this by either withholding food or withholding sleep, by initiating anxiety and fear, by essentially controlling the individual until that person loses his own identity and takes up the identity of the individuals that they are involved with; that many times the individuals are hypnotized and are objects of hypnosis and autohypnosis where certain key phrases and certain words will trigger a certain kind of thought pattern within the individual.

He testified that Miss Underwood was not psychotic, that she did not have any symptoms of a standard medical diagnosis of mental disturbance, and that she was not hypnotized. He did conclude that her symptoms were consistent with those of an individual who had been subjected to coercive persuasion, and that she was likely to be deceived by artful and designing persons. He also opined that she required immediate psychiatric treatment because she was in an abnormal situation and she should not be further exposed to it. He stated that it was difficult to predict for lack of data what the outcome would be but he believed that from long exposure Miss Underwood's symptoms were more stationary and severe than the others. He acknowledged, however, that he could not tell from his examination whether there would be an

abrupt change in her mental status over the ensuing 30 days, and that there was no indication that there would be a rapid deterioration in her mental state during that period.

The doctor stated that Hovard was the most disturbed of the five individuals he examined, and that he had some concerns about his mental health. He opined that whether Hovard's mental health would deteriorate in the ensuing 30 to 60 days would depend on the stress he was subjected to. With respect to Miss Brown, the doctor testified that her mental, emotional state would not substantially deteriorate within the ensuing 30 to 60 days if she remained with the organization. With respect to Miss Kaplan, the doctor stated that he was doubtful, and it was possible her mental or emotional state could deteriorate if she were left in her former environment. He generally stated that it would not be in the best interests of the health of any of the five to continue whatever it was they were doing for the next six months, and that he felt this most strongly with respect to Hovard.

A qualified clinical psychologist who had done research in the field of repatriated prisoners of war and interned civilians from the Korean War, also testified for the parents on the results of the joint examination. She testified that pictures drawn by the young adults at her request at the conclusion of the interview displayed the characteristics of pictures drawn by prisoners of war who had been subjected to coercive persuasion. On the basis of the drawings, the history received from the parents and their offspring, her interviews of from 40 to 50 former young adults who had been members of the Unification Church, and her examination of proposed conservatees, she stated that each was the victim of artful and designing persons as a result of the coercive persuasion to which he or she had been subjected during the time they were in the Unification Church; that there was an emergency situation and they all were in need of treatment; and that only reality therapy as was provided by the staff of Freedom Ranch was appropriate. In each case the psychologist found a generally impaired level of functioning, and an unwillingness to make evaluative statements or comparisons, which reflected an impairment of judgment.

She acknowledged that what she observed and found did not fit into any class under headings offered in a standard psychiatric and psychological diagnostic and statistical manual; and that the constraint attendant to the treatment program did not involve a psychiatric problem. She at first studiously avoided testifying that the Unification Church practiced

coercive persuasion, but consistently referred to the personal experiences of persons whom she had studied and of the conservatees while with members of the church as consistent with those used for coercive persuasion. She did finally opine on the basis of that data that the Unification Church practiced coercive persuasion on its members. She concluded that in a broad sense that church was a religion, but in a limited sense it was not.

The proposed conservatees each testified in opposition to the parent's petitions. Each sought to follow the beliefs and mode of living he or she had elected to follow. Each denied any coercive persuasion, and pointed out that there was no physical restraint exercised. In fact Miss Brown had left the group and returned after four days of reflection. Each explained the manner in which he or she was invited to join and become a member of the group, and the experiences that resulted thereafter. From their testimony it appeared that proselyting was done in the name of an organization other than the church, and that the Unification Church itself or Reverend Moon were not mentioned until the prospect had been with the group for a period of time; that the converts led Spartan lives with respect to food, accommodations and hours of fund raising activities; and that on occasion evasive answers were given while soliciting funds. They also explained their reaction to the examination and confrontation with the parents' psychiatrist and psychologist, and insisted on their competency.

A psychiatrist and a psychologist, who actually tested the proposed conservatees, also testified on their behalf. The former pointed out that "coercive persuasion" in the absence of drugs, hypnosis, physical captivity or some greater fear was no more than speculative theory, and that the experiences relied upon by the parents' experts were no more than usually accompany devotion to a religious belief. He also confirmed that the proposed conservatees did not suffer from any mental pathological condition, and disagreed with the existence of the symptoms found by the parents' experts, and their conclusions as to the exposure of the prospective conservatees to "coercive persuasion" as used by those experts, and their conclusions as to the young adults' susceptibility to being deceived or imposed upon by artful and designing persons. This psychiatrist had a law degree, as well as a medical degree, and admittedly had testified against legislation which would permit guardianship proceedings to be applied to persons who become members of a nonconforming organization, or in other than gravely serious situations. He questioned the propriety of the artful and designing person test

because of the difficulty of distinguishing between what could be considered proper or improper art and design.

The conservatees' clinical psychologist gave each a clean bill of health on the basis of three tests he conducted. He testified that these tests would reveal symptoms similar to those experienced by prisoners of war who were subjected to similar tests but that they did not with the conservatees. He expressly repudiated the findings of the parents' experts with regard to some of the symptoms they relied upon, and he made it clear that there was no emergency.

The conservatees also presented the testimony of two persons who had undergone deprogramming under the auspices of those with whom it was proposed to place the conservatees. One was a member of the Unification Church.

■ The parents rely upon the substantial evidence rule. In *Guardianship of Walters* (1951) 37 Cal.2d 239 [231 P.2d 473], the court ruled, "All conflicts and any reasonable doubt as to the sufficiency of the evidence must be resolved in favor of the order. [Citations.] In cases of this type, as in any other, we must uphold the findings of the trial court if there is any substantial evidence which, together with the aid of all inferences reasonably to be drawn from it, tends to support the judgment. [Citations.]" (37 Cal.2d at p. 245. See also *Guardianship of Brown* (1976) 16 Cal.3d 326, 336-337 [128 Cal.Rptr. 10, 546 P.2d 298]; *Estate of Cowper* (1918) 179 Cal. 347, 349 [176 P. 676]; *Estate of Schulmeyer, supra,* 171 Cal. 340, 342-343; *Matter of Coburn, supra,* 165 Cal. 202, 212-213; *Estate of Baldridge* (1954) 122 Cal.App.2d 752, 753 [266 P.2d 103]; *Guardianship of Peterson* (1948) 84 Cal.App.2d 541, 545 [191 P.2d 98]; and *In re Coburn, supra,* 11 Cal.App. 604, 611, Hall, J. and Kerrigan, J. conc.)

On the other hand when the evidence is insufficient to support a necessary finding, express or implied, the judgment or order cannot be sustained. (See *Guardianship of Brown, supra,* 16 Cal.3d 326, 337-340; *Guardianship of Waite* (1939) 14 Cal.2d 727, 731 [97 P.2d 238]; *Estate of Watson, supra,* 176 Cal. 342, 346; *Estate of Baldridge, supra,* 122 Cal.App.2d 752, 755-756; and *In re Coburn, supra,* 11 Cal.App. 604, 609-620, Cooper P. J.)

Reasonable minds could differ over the validity of the concept advanced by the parents' experts, and the validity of their findings

concerning the psychological state of the proposed conservatees. It must, however, be conceded that there was testimony, which if believed, sustained the implied conclusion from the court's order that each of the conservatees was a person, who because of having been subjected to coercive persuasion (popularly "brainwashing"), was likely to be deceived or imposed upon by artful or designing persons, and that it was necessary to reverse that process. We feel that the evidence was insufficient to sustain a finding that there was any emergency authorizing good cause for appointment of a temporary conservator, but since there was a full hearing in this case and other reasons compel a setting aside of the order, we do not dwell on that point.

Here it is not the conservatee's estate that is to be protected, but his mind. The statutory authorization has been analyzed as follows: "An individual who is not otherwise in need of a conservator and who is willing to accept, and able to carry out, the decisions made for him by relatives or friends about personal matters—where to live, what to do, and what to eat—does not require a conservator of the person, regardless of his physical or mental condition. Conversely, an individual who is unwilling or unable to accept reasonable directions in the conduct of his personal life requires a conservator of the person. So does one who is physically or mentally unable to consent to medical or dental services." (Johnstone & Zillgitt, Cal. Conservatorships (Cont.Ed.Bar 1968) § 3.3, p. 54.) As we have noted (fn. 5), the law now provides that a conservatorship of the person shall be appointed if an individual "is unable properly to provide for his personal needs for physical health, food, clothing or shelter." (§ 1751, as amended.) We take that as declaratory of the former first ground—"unable properly to care for himself." There is no real showing here that the conservatees are physically unhealthy, or actually deprived of, or unable to secure food, clothing and shelter. Justification for the appointment under the second ground can only be attributed to a necessity to secure treatment medical or otherwise, which it cannot be gainsayed, is to affect the conservatee's mental health.

In this setting we believe that the provisions of the amendments operative July 1, 1977, are declaratory of the common law. Section 1851 expressly provides that involuntary civil mental health treatment for a conservatee shall be obtained only under the provisions of the Welfare and Institutions Code (fn. 12 above). Decisions of the courts of this state indicate that prior thereto an individual was entitled to no less rights because of the constitutional principles of equal protection and due process of law. We leave aside the question of emergency medical

treatment to save life (cf. *Application of President & Directors of Georgetown Col.* (D.C.Cir. 1964) 331 F.2d 1000, 1007-1010 [118 App.D.C. 80, 9 A.L.R.3d 1367], with *Winters* v. *Miller* (2d Cir. 1971) 446 F.2d 65, 70-71 [cert. den. (1971) 404 U.S. 985 (30 L.Ed.2d 369, 92 S.Ct. 450)], and turn to those decisions.

■ On attaining majority a child is emancipated from the control of the parent. (Civ. Code, § 204; *Dittrich* v. *Gobey* (1898) 119 Cal. 599, 601 [51 P. 926].) It is recognized that on so attaining majority a person can no longer be subjected to any extraordinary procedures or controls applicable to minors. (See *In re Gary W., supra,* 5 Cal.3d 296, 305-306; and Civ. Code, § 43. Cf. *In re Roger S.* (1977) 19 Cal.3d 655, 662, 667-669 and 672-673 [139 Cal.Rptr. 861, 566 P.2d 997].)

Even with a minor child the parents' right to secure treatment which will involve curtailment of the child's liberty is restricted. "Neither the state, nor the parent, has an interest in committing a child to a state mental hospital for care and treatment if the child is not in need of treatment or if treatment can be provided without so drastically curtailing the freedom of the child. Recognition of the child's right to demand due process in the proceedings leading to commitment does not therefore impermissibly impinge on the parent's right to control the upbringing of his child." (*In re Roger S., supra,* 19 Cal.3d at p. 664.) It is also established that the actual commitment of a mentally disordered minor who is also a ward of the juvenile court can be accomplished only in accordance with the Lanterman-Petris-Short Act. (Welf. & Inst. Code, §§ 5000-5401.) (*In re Michael E.* (1975) 15 Cal.3d 183, 189 and 192 [123 Cal.Rptr. 103, 538 P.2d 231]. See also *In re Michael D., supra,* 70 Cal.App.3d 522, 529-530; and *In re L. L., supra,* 39 Cal.App.3d 205, 213.)

If a minor, in whose health the state has an interest, which may overcome some parental and constitutional rights, is so protected, it cannot deny an adult commensurate procedural protection. (*Baxstrom* v. *Herold* (1966) 383 U.S. 107, 115 [15 L.Ed.2d 620, 625-626, 86 S.Ct. 760].) *In re Roger S., supra,* 19 Cal.3d 655 concluded that although the personal liberty interest of a minor is less comprehensive than that of an adult, and a parent or guardian not only may, but must, curtail that interest in the proper exercise of his obligation to guide the child's development, in the area of admission to a state hospital a minor of 14 years or more possesses rights which may not be waived by the parent or guardian. With respect to the first point, the court noted the following rights of an adult: "The liberty interest of an adult may sufficiently outweigh the

state's interest in promoting optimal mental health that the state may not confine a nondangerous adult solely for the purpose of treating that person's mental illness. Clearly the state may not involuntarily confine a harmless mentally ill individual without providing treatment. (*O'Connor v. Donaldson, supra* [1975], 422 U.S. 563, 576 [45 L.Ed.2d 396, 407].) Whether or not it might constitutionally do so, the Legislature has not permitted involuntary confinement of harmless mentally ill adults or juvenile court wards in state mental hospitals unless they are gravely disabled." (*Id.,* pp. 667-668.)

It has been recognized that since 1969 the Lanterman-Petris-Short Act was intended as the only mechanism for the involuntary institutionalization of persons who are gravely disabled, i.e., "unable to provide for his basic personal needs for food, clothing or shelter." (Welf. & Inst. Code, § 5008, subd. (h); cf. § 1751, as operative July 1, 1977, fn. 5 above; Johnstone et al., Cal. Conservatorships (Cont.Ed.Bar Supp. 1976) § 5.6, pp. 50-51; and Ops. Nos. CV 73-112 and CV 74-327 (1975) 58 Ops.Cal.Atty.Gen. 50, 57-60 and 849. See also Fornasero, *Substantive Constitutional Rights of the Mentally Ill* (1974) 7 U.C.Davis L.Rev. 128; Barnhart et al., *Informed Consent to Organic Behavior Control* (1977) 17 Santa Clara L.Rev. 39; and note Welf. & Inst. Code, § 5325, subds. (f) and (g).)

█ If an adult person is less than gravely disabled we find no warrant for depriving him or her of liberty and freedom of action under either the former provisions of the Probate Code, or the Welfare and Institutions Code. If there is coercive persuasion or brainwashing which requires treatment, the existence of such a mental disability and the necessity of legal control over the mentally disabled person for the purpose of treatment should be ascertained after compliance with the protection of civil liberties provided by the Welfare and Institutions Code. To do less is to license kidnaping for the purpose of thought control. We conclude that the provisions of the Probate Code could not be applied to justify the appointment of a conservator of the person on the evidence presented in this case.

## IV

█ As an alternative ground of decision we are asked to find that the temporary orders violated the conservatees' rights to freedom of religion and association under the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, §§ 1 and 4.) The parents claim

that there is no freedom of action, freedom of religion, or freedom of assembly involved, that the sole issue is whether or not the conservatees have been deprived of their reasoning powers by artful and designing persons. On behalf of the conservatees it is urged that since an alleged religious group is involved, there can be no inquiry into the validity of the beliefs held by the members of that group, and the proceedings below trespassed into that field. We find that the law applicable to this case is not as myopic, but is more perceptive than the conservatees assert, and that the facts cannot be as simply interpreted as the parents contend.

In finding that a religious conviction against working on Saturday was good cause for failing to accept suitable work with respect to the right to receive unemployment benefits the Supreme Court tersely reviewed the principles developed under the First Amendment as follows: "The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, *Cantwell* v. *Connecticut,* 310 U.S. 296, 303 [discretionary licensing of religious solicitations]. Government may neither compel affirmation of a repugnant belief, *Torcaso* v. *Watkins,* 367 U.S. 488 [religious test for office]; nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, *Fowler* v. *Rhode Island,* 345 U.S. 67 [discrimination in use of park]; nor employ the taxing power to inhibit the dissemination of particular religious views [citations]. On the other hand, the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' *Braunfeld* v. *Brown,* 366 U.S. 599, 603 [Sunday closing]. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order. See, e.g., *Reynolds* v. *United States,* 98 U.S. 145 [polygamy]; *Jacobson* v. *Massachusetts,* 197 U.S. 11 [compulsory vaccination]; *Prince* v. *Massachusetts,* 321 U.S. 158 [child labor]; *Cleveland* v. *United States,* 329 U.S. 14 [prostitution/polygamy]." (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 402-403 [10 L.Ed.2d 965, 969-970, 83 S.Ct. 1790] [editorial comments added]. See also, *Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 219-220 and 229-230 [32 L.Ed.2d 15, 27-28 and 32-34, 92 S.Ct. 1526] [compulsory secondary education proscribed] *People* v. *Woody* (1964) 61 Cal.2d 716, 723-726 [40 Cal.Rptr. 69, 394 P.2d 813] [prohibition of use of peyote for religious services proscribed]; *Pencovic* v. *Pencovic* (1955) 45 Cal.2d 97, 102-103 [287 P.2d 501] [compulsory support of child upheld]; *Perez* v. *Sharp* (1948) 32 Cal.2d 711, 713 [198 P.2d 17] [prohibition of miscegenation proscribed]; *Gospel*

*Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232, 242-248 [163 P.2d 704] [nondiscriminatory licensing of charitable solicitors upheld]; *Citizens for Parental Rights* v. *San Mateo County Bd. of Education* (1975) 51 Cal.App.3d 1, 11-20 and 27 [124 Cal.Rptr. 68] [implementation of noncompulsory family life and sex education courses upheld]; *People* v. *Mullins* (1975) 50 Cal.App.3d 61, 69-71 [123 Cal.Rptr. 201] [prohibition of use of marijuana upheld]; *Montgomery* v. *Board of Retirement* (1973) 33 Cal.App.3d 447, 450-452 [109 Cal.Rptr. 181] [right to nonservice connected disability retirement benefits despite refusal to submit to treatment upheld]; *People* v. *Collins* (1969) 273 Cal.App.2d 486, 488 [78 Cal.Rptr. 151] [prohibition on use of marijuana upheld]; *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 476 [64 Cal.Rptr. 808] [right to discharge incompetent school bus driver upheld]; *Estate of Supple* (1966) 247 Cal.App.2d 410, 414 [55 Cal.Rptr. 542] [alleged undue influence and fraud on testator rejected] [cert. den. (1967) 389 U.S. 820 (19 L.Ed.2d 70, 88 S.Ct. 37)]; *People* v. *Mitchell* (1966) 244 Cal.App.2d 176, 181-182 [52 Cal.Rptr. 884] [prohibition on use of marijuana upheld]; *Sec. & Exchange Com'n.* v. *World Radio Mission, Inc.* (1st Cir. 1976) 544 F.2d 535, 538-540 [sale of "Loan Plans" and "Land Bonds Loan Plans" subject to anti-fraud provisions of federal security acts]; *Kennedy* v. *Meacham* (10th Cir. 1976) 540 F.2d 1057, 1061 [right to practice religion in prison]; *Founding Church of Scientology* v. *United States* (D.C.Cir. 1969) 409 F.2d 1146, 1154-1161 [133 App.D.C. 229, 13 A.L.R.Fed. 721] [literature accompanying device for religious practices not subject to mislabeling provisions of federal and drug regulations] [cert. den. (1969) 396 U.S. 963 (24 L.Ed.2d 427, 90 S.Ct. 434)]; *Baer* v. *City of Bend* (1956) 206 Ore. 221, 229-235 [292 P.2d 134, 136-141] [fluoridation upheld]; and *State* ex rel. *Holcomb* v. *Armstrong* (1952) 39 Wn.2d 860, 863-864 [239 P.2d 545, 547-548] [compulsory chest X-ray as condition of entry to state university upheld].)

The classic statement concerning the scope of a religion projected by the First Amendment is found in *United States* v. *Ballard* (1944) 322 U.S. 78 [88 L.Ed. 1148, 64 S.Ct. 882], an action involving a prosecution for using and conspiring to use the mails to defraud. The court reversed a judgment of the circuit court of appeals which had reversed the defendants' convictions because the trial court had withdrawn from the jury the question of the truth or falsity of the defendants' representations, which admittedly covered their alleged religious doctrines and beliefs, and submitted the case on the issue of whether they honestly and in good faith believed in them. In remanding the case to the circuit court of appeals for further consideration the court ruled that the truth or verity

of respondents' religious doctrines or beliefs should not have been submitted to the jury. (322 U.S. at p. 86 [88 L.Ed. at p. 1153-1154].) The court stated as follows: " 'The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.' *Watson* v. *Jones,* 13 Wall. 679, 728. The First Amendment has a dual aspect. It not only 'forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship' but also 'safeguards the free exercise of the chosen form of religion.' *Cantwell* v. *Connecticut,* 310 U.S. 296, 303. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.' *Id.,* pp. 303-304. Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. [Citation.] It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain. The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. [Citation.] As stated in *Davis* v. *Beason,* 133 U.S. 333, 342, 'With man's relations to his Maker and the obligations he

may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with.' " (*Id.,* pp. 86-87 [88 L.Ed. pp. 1153-1154]. See also *United States* v. *Seeger* (1965) 380 U.S. 163, 174-175 and 180-183 [13 L.Ed.2d 733, 741-742 and 745-747, 85 S.Ct. 850]; *Saint Germain Foundation* v. *County of Siskiyou* (1963) 212 Cal.App.2d 911, 916 [28 Cal.Rptr. 393]; and *Fellowship of Humanity* v. *Co. Alameda* (1957) 153 Cal.App.2d 673, 681-693 [315 P.2d 394] for discussion of what constitutes religion.)

As noted in the foregoing quotation and the cases we have referred to, there is a distinction between interference with a person's beliefs and a person's acts. Nevertheless where does belief end and action begin? In *Wisconsin* v. *Yoder, supra,* the court noted: "This case, therefore, does not become easier because respondents were convicted for their 'actions' in refusing to send their children to the public high school; in this context belief and action cannot be neatly confined in logic-tight compartments." (406 U.S. at p. 220 [32 L.Ed.2d at pp. 27-28]. See also Jackson, J. dis., *United States* v. *Ballard, supra,* 332 U.S. at pp. 92-95 [88 L.Ed. at pp. 1156-1158].) Evidence was introduced of the actions of the proposed conservatees in changing their life style. When the court is asked to determine whether that change was induced by faith or by coercive persuasion is it not in turn investigating and questioning the validity of that faith? At the same time the trier of fact is asked to adjudge the good faith and bona fideness of the beliefs of the conservatees preceptors.[13] If it be assumed that certain leaders were using psychological methods to proselytyze and hold the allegiance of recruits to the church or cult, call it what we will, can it be said their

---

[13] In examining the cases that have proscribed restrictions on religious practices we find recognition of the principle that the immunity must depend on a bona fide belief in the principles of the religion, although those principles themselves are free from scrutiny. "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury. Without a doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. The State is likewise free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience." (*Cantwell* v. *Connecticut, supra,* 310 U.S. at pp. 306-307 [84 L.Ed. at pp. 1219-1220]; see also *People* v. *Woody, supra,* 61 Cal.2d 716, 726-727; *In re Grady* (1964) 61 Cal.2d 887, 888 [39 Cal.Rptr. 912, 394 P.2d 728]; *People* v. *Mullins, supra,* 50 Cal.App.3d 61, 70; and *Estate of Supple, supra,* 247 Cal.App.2d 410, 414-415.)

actions were not dictated by faith merely because others who engaged in such practices have recanted? The total picture disclosed must be tested by principles applicable to the regulation of acts of religious organizations and their members.

Before examining the application of those principles we note that even if the organization be deemed political, and not religious, there is also freedom of association involved. In upholding the right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights, the Supreme Court of the United States concluded by stating, "The course of our decisions in the First Amendment area makes plain that its protections would apply as fully to those who would arouse our society against the objectives of the petitioner. [Citations.] For the Constitution protects expression and association without regard to the race, creed, or political or religious affiliation of the members of the group which invokes its shield, or to the truth, popularity, or social utility of the ideas and beliefs which are offered." (*N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 444-445 [9 L.Ed.2d 405, 424-425, 83 S.Ct. 328]. See also *United States* v. *Robel* (1967) 389 U.S. 258, 263 [19 L.Ed.2d 508, 513, 88 S.Ct. 419]; and *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 250-251 [1 L.Ed.2d 1311, 1324-1325, 77 S.Ct. 1203].)

The test of interference with action in the above fields, which are protected by the First Amendment, is a compelling state interest. (*Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 221-229 [32 L.Ed.2d 15, 28-33]; *Sherbert* v. *Verner, supra,* 374 U.S. 398, 403 [10 L.Ed.2d 965, 969-970]; *N.A.A.C.P.* v. *Button, supra,* 371 U.S. 415, 438 [9 L.Ed.2d 405, 421]; *People* v. *Woody, supra,* 61 Cal.2d 716, 722; *People* v. *Mullins, supra,* 50 Cal.App.3d 61, 68; and *Montgomery* v. *Board of Retirement, supra,* 33 Cal.App.3d 447, 451-452.) The cases reviewed demonstrate that the state may have a compelling state interest in preventing fraud under the guise of religious belief. If such is the case criminal sanctions may be imposed where there is no bona fide conviction on the part of the actors. However, the question of proof of that element was not settled by *United States* v. *Ballard, supra.* (Cf. majority opn., dis. opn. of Stone, and dis. opn. of Jackson, 322 U.S. at pp. 86, 90 and 92-95 [88 L.Ed. at pp. 1153-1154, 1155-1156, and 1156-1158].) We also recognize that the state has an interest in the health of its citizens. The exercise of this right was explored above in part II. ▇▇▇ We conclude that in the absence of

such actions as render the adult believer himself gravely disabled as defined in the law of this state, the processes of this state cannot be used to deprive the believer of his freedom of action and to subject him to involuntary treatment. As Justice Jackson stated in dissenting in *United States* v. *Ballard,* "The wrong of these things, as I see it, is not in the money the victims part with half so much as in the mental and spiritual poison they get. But that is precisely the thing the Constitution put beyond the reach of the prosecutor, for the price of freedom of religion or of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish." (322 U.S. at p. 95 [88 L.Ed. at p. 1158].)

## V

There remains the question of the pending order to show cause regarding contempt. A hearing on that matter is complicated by the necessity of proving that those who are charged received notice of the restrictions on the conservators that were imposed by this court. There is no showing that alleged agents of the conservators and others who allegedly participated in prohibited deprogramming were ever subjected to the process of this court, or that they can now be served and brought within its jurisdiction. There are questions of whether any of the conservatees, in accordance with this court's order, requested to see the deprogrammers, and, if so, whether such requests were voluntary. A further issue is whether the presence of the deprogrammers was required to prevent harassment by members of the church. We are mindful that three of the conservatees did recant, consented to the temporary conservatorships and presumably rejoined their parents and adopted their former lifestyle. A fourth has requested that no proceedings be taken against her parents. Only the fifth has requested that we proceed.

We have weighed the unquestioned necessity of preserving and enforcing the integrity of the orders of this court with the peculiar circumstances of this case. We conclude that further prosecution of the contempt proceedings in the case of the first four conservatees is unwarranted because although it might possibly lead to deserved punishment of some who participated in violating the mandate of this court, it is more apt to disrupt inter-family relations which probably have stabilized at this point in time, and at best might only reach those who were inspired by meritorious feelings of paternal devotion. For the latter reason we reject the appeal of the fifth conservatee for further proceed-

ings. The order to show cause for the alleged contempt will be discharged.

## VI

Petitioners have waived all and any claim to an award of attorneys' fees against real parties in interest. It is thereby unnecessary to examine the validity of their claim.

We do have authority to impose costs. (Code Civ. Proc., § 1095; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 175.) The dismissal of the proceedings as to the three petitioners will be subject to the payment of costs by real parties in interest affected by those proceedings.

The petition is granted with respect to petitioners Hovard, Jr., and Kaplan. Let a peremptory writ of mandate issue directing the respondent superior court to set aside and vacate its orders appointing temporary conservators for each of said petitioners and the letters of temporary conservatorship issued thereon. Subject to the payment of costs by their respective conservators, the petitions of petitioners Katz, Underwood and Brown are dismissed. Costs of the joint petitions are assessed jointly and severally against the several real parties in interest as they may be taxed in the trial court upon the filing of the remittitur. The order to show cause re contempt issued April 5, 1977, is discharged. The prayer for attorneys' fees is denied.

Elkington, J., and Lazarus, J.,* concurred.

Petitions for a rehearing were denied November 4, 1977, and the opinion was modified to read as printed above. The petition of the real parties in interest for a hearing by the Supreme Court was denied December 15, 1977. Mosk, J., and Clark, J., were of the opinion that the petition should be granted.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.